# GEORGIA *v.* McCOLLUM ET AL.

No. 91–372. Argued February 26, 1992—Decided June 18, 1992

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, KENNEDY, and SOUTER, JJ., joined. REHNQUIST, C. J., filed a concurring opinion, *post*, p. 59. THOMAS, J., filed an opinion concurring in the judgment, *post*, p. 60. O'CONNOR, J., *post*, p. 62, and SCALIA, J., *post*, p. 69, filed dissenting opinions.

*Harrison W. Kohler*, Senior Assistant Attorney General of Georgia, argued the cause for petitioner. With him on the briefs were *Michael J. Bowers*, Attorney General, and *Charles M. Richards*, Senior Assistant Attorney General.

*Michael R. Dreeben* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller,* and *Deputy Solicitor General Bryson.*

*Robert H. Revell, Jr.,* argued the cause for respondents. With him on the brief was *Jesse W. Walters.**

JUSTICE BLACKMUN delivered the opinion of the Court.

For more than a century, this Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause. See, *e. g., Strauder* v. *West Virginia,* 100 U. S. 303 (1880). Last Term this Court held that racial discrimination in a civil litigant's exercise of peremptory challenges also violates the Equal Protection Clause. See *Edmonson* v. *Leesville Concrete Co.,* 500 U. S. 614 (1991). Today, we are asked to decide whether the Constitution prohibits a *criminal defendant* from engaging in purposeful racial discrimination in the exercise of peremptory challenges.

I

On August 10, 1990, a grand jury sitting in Dougherty County, Ga., returned a six-count indictment charging respondents with aggravated assault and simple battery. See App. 2. The indictment alleged that respondents beat and assaulted Jerry and Myra Collins. Respondents are white; the alleged victims are African-Americans. Shortly after the events, a leaflet was widely distributed in the local African-American community reporting the assault and urging community residents not to patronize respondents' business.

Before jury selection began, the prosecution moved to prohibit respondents from exercising peremptory challenges in

---

*Briefs of *amici curiae* urging reversal were filed for the Criminal Justice Legal Foundation by *Kent Scheidegger* and *Charles L. Hobson;* and for the NAACP Legal Defense and Educational Fund, Inc., by *Julius L. Chambers, Charles Stephen Ralston,* and *Eric Schnapper.*

Briefs of *amici curiae* were filed for the National Association of Criminal Defense Lawyers by *Judy Clarke* and *Mario G. Conte;* and for *Charles J. Hynes,* pro se, by *Jay M. Cohen, Matthew S. Greenberg, Victor Barall,* and *Carol Teague Schwartzkopf.*

a racially discriminatory manner. The State explained that it expected to show that the victims' race was a factor in the alleged assault. According to the State, counsel for respondents had indicated a clear intention to use peremptory strikes in a racially discriminatory manner, arguing that the circumstances of their case gave them the right to exclude African-American citizens from participating as jurors in the trial. Observing that 43 percent of the county's population is African-American, the State contended that, if a statistically representative panel is assembled for jury selection, 18 of the potential 42 jurors would be African-American.[1] With 20 peremptory challenges, respondents therefore would be able to remove all the African-American potential jurors.[2] Relying on *Batson* v. *Kentucky*, 476 U. S. 79 (1986), the Sixth Amendment, and the Georgia Constitution, the State sought an order providing that, if it succeeded in making out a prima facie case of racial discrimination by respondents, the latter would be required to articulate a racially neutral explanation for peremptory challenges.

The trial judge denied the State's motion, holding that "[n]either Georgia nor federal law prohibits criminal defendants from exercising peremptory strikes in a racially discriminatory manner." App. 14. The issue was certified for immediate appeal. *Id.*, at 15 and 18.

The Supreme Court of Georgia, by a 4-to-3 vote, affirmed the trial court's ruling. 261 Ga. 473, 405 S. E. 2d 688 (1991). The court acknowledged that in *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614 (1991), this Court had found that the exercise of a peremptory challenge in a racially discriminatory manner "would constitute an impermissible injury" to the excluded juror. 261 Ga., at 473, 405 S. E. 2d, at 689.

---

[1] Under Georgia law, the petit jury in a felony trial is selected from a panel of 42 persons. Ga. Code Ann. § 15–12–160 (1990).

[2] When a defendant is indicted for an offense carrying a penalty of four or more years, Georgia law provides that he may "peremptorily challenge 20 of the jurors impaneled to try him." § 15–12–165.

The court noted, however, that *Edmonson* involved private civil litigants, not criminal defendants. "Bearing in mind the long history of jury trials as an essential element of the protection of human rights," the court "decline[d] to diminish the free exercise of peremptory strikes by a criminal defendant." 261 Ga., at 473, 405 S. E. 2d, at 689. Three justices dissented, arguing that *Edmonson* and other decisions of this Court establish that racially based peremptory challenges by a criminal defendant violate the Constitution. 261 Ga., at 473, 405 S. E. 2d, at 689 (Hunt, J.); *id.*, at 475, 405 S. E. 2d, at 690 (Benham, J.); *id.*, at 479, 405 S. E. 2d, at 693 (Fletcher, J.). A motion for reconsideration was denied. App. 60.

We granted certiorari to resolve a question left open by our prior cases—whether the Constitution prohibits a criminal defendant from engaging in purposeful racial discrimination in the exercise of peremptory challenges.[3] 502 U. S. 937 (1991).

## II

Over the last century, in an almost unbroken chain of decisions, this Court gradually has abolished race as a consideration for jury service. In *Strauder* v. *West Virginia*, 100 U. S. 303 (1880), the Court invalidated a state statute providing that only white men could serve as jurors. While stating that a defendant has no right to a "petit jury composed in whole or in part of persons of his own race," *id.*, at 305, the Court held that a defendant does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria. See also *Neal* v. *Delaware*, 103 U. S. 370,

---

[3] The Ninth Circuit recently has prohibited criminal defendants from exercising peremptory challenges on the basis of gender. *United States* v. *De Gross*, 960 F. 2d 1433 (1992) (en banc). Although the panel decision now has been vacated by the granting of rehearing en banc, a Fifth Circuit panel has held that criminal defendants may not exercise peremptory strikes in a racially discriminatory manner. See *United States* v. *Greer*, 939 F. 2d 1076, rehearing granted, 948 F. 2d 934 (1991).

397 (1881); *Norris* v. *Alabama*, 294 U. S. 587, 599 (1935) (State cannot exclude African-Americans from jury venire on false assumption that they, as a group, are not qualified to serve as jurors).

In *Swain* v. *Alabama*, 380 U. S. 202 (1965), the Court was confronted with the question whether an African-American defendant was denied equal protection by the State's exercise of peremptory challenges to exclude members of his race from the petit jury. *Id.*, at 209–210. Although the Court rejected the defendant's attempt to establish an equal protection claim premised solely on the pattern of jury strikes in his own case, it acknowledged that proof of systematic exclusion of African-Americans through the use of peremptories over a period of time might establish such a violation. *Id.*, at 224–228.

In *Batson* v. *Kentucky*, 476 U. S. 79 (1986), the Court discarded *Swain*'s evidentiary formulation. The *Batson* Court held that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury based solely on the prosecutor's exercise of peremptory challenges at the defendant's trial. *Id.*, at 87. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.*, at 97.[4]

Last Term this Court applied the *Batson* framework in two other contexts. In *Powers* v. *Ohio*, 499 U. S. 400 (1991), it held that in the trial of a white criminal defendant, a prosecutor is prohibited from excluding African-American jurors

---

[4] The *Batson* majority specifically reserved the issue before us today. 476 U. S., at 89, n. 12. The two *Batson* dissenters, however, argued that the "clear and inescapable import" was that *Batson* would similarly limit defendants. *Id.*, at 125–126. Justice Marshall agreed, stating: "[O]ur criminal justice system 'requires not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' *Hayes* v. *Missouri*, 120 U. S. 68, 70 (1887)." *Id.*, at 107 (concurring opinion).

on the basis of race. In *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614 (1991), the Court decided that in a civil case, private litigants cannot exercise their peremptory strikes in a racially discriminatory manner.[5]

In deciding whether the Constitution prohibits criminal defendants from exercising racially discriminatory peremptory challenges, we must answer four questions. First, whether a criminal defendant's exercise of peremptory challenges in a racially discriminatory manner inflicts the harms addressed by *Batson*. Second, whether the exercise of peremptory challenges by a criminal defendant constitutes state action. Third, whether prosecutors have standing to raise this constitutional challenge. And fourth, whether the constitutional rights of a criminal defendant nonetheless preclude the extension of our precedents to this case.

### III

### A

The majority in *Powers* recognized that "*Batson* 'was designed "to serve multiple ends,"' only one of which was to protect individual defendants from discrimination in the selection of jurors." 499 U. S., at 406. As in *Powers* and *Edmonson*, the extension of *Batson* in this context is designed to remedy the harm done to the "dignity of persons" and to the "integrity of the courts." *Powers*, 499 U. S., at 402.

As long ago as *Strauder*, this Court recognized that denying a person participation in jury service on account of his race unconstitutionally discriminates against the excluded juror. 100 U. S., at 308. See also *Batson*, 476 U. S., at 87. While "[a]n individual juror does not have a right to sit on any particular petit jury, . . . he or she does possess the right not to be excluded from one on account of race." *Powers*,

---

[5] In his dissent in *Edmonson*, JUSTICE SCALIA stated that the effect of that decision logically must apply to defendants in criminal prosecutions. 500 U. S., at 644.

499 U. S., at 409. Regardless of who invokes the discriminatory challenge, there can be no doubt that the harm is the same—in all cases, the juror is subjected to open and public racial discrimination.

But "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Batson*, 476 U. S., at 87. One of the goals of our jury system is "to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair." *Powers*, 499 U. S., at 413. Selection procedures that purposefully exclude African-Americans from juries undermine that public confidence—as well they should. "The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause." *Id.*, at 412. See generally Underwood, Ending Race Discrimination in Jury Selection: Whose Right Is It, Anyway?, 92 Colum. L. Rev. 725, 748–750 (1992).

The need for public confidence is especially high in cases involving race-related crimes. In such cases, emotions in the affected community will inevitably be heated and volatile. Public confidence in the integrity of the criminal justice system is essential for preserving community peace in trials involving race-related crimes. See Alschuler, The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, 56 U. Chi. L. Rev. 153, 195–196 (1989) (describing two trials in Miami, Fla., in which all African-American jurors were peremptorily struck by white defendants accused of racial beating, and the public outrage and riots that followed the defendants' acquittal).

"[B]e it at the hands of the State or the defense," if a court allows jurors to be excluded because of group bias, "[it] is [a] willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens'

confidence in it." *State* v. *Alvarado,* 221 N. J. Super. 324, 328, 534 A. 2d 440, 442 (1987). Just as public confidence in criminal justice is undermined by a conviction in a trial where racial discrimination has occurred in jury selection, so is public confidence undermined where a defendant, assisted by racially discriminatory peremptory strikes, obtains an acquittal.[6]

## B

The fact that a defendant's use of discriminatory peremptory challenges harms the jurors and the community does not end our equal protection inquiry. Racial discrimination, although repugnant in all contexts, violates the Constitution only when it is attributable to state action. See *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 172 (1972). Thus, the second question that must be answered is whether a criminal defendant's exercise of a peremptory challenge constitutes state action for purposes of the Equal Protection Clause.

Until *Edmonson,* the cases decided by this Court that presented the problem of racially discriminatory peremptory challenges involved assertions of discrimination by a prosecutor, a quintessential state actor. In *Edmonson,* by contrast, the contested peremptory challenges were exercised by a private defendant in a civil action. In order to determine whether state action was present in that setting, the

---

[6] The experience of many state jurisdictions has led to the recognition that a race-based peremptory challenge, regardless of who exercises it, harms not only the challenged juror, but the entire community. Acting pursuant to their state constitutions, state courts have ruled that criminal defendants have no greater license to violate the equal protection rights of prospective jurors than have prosecutors. See, *e. g., State* v. *Levinson,* 71 Haw. 492, 795 P. 2d 845 (1990); *People* v. *Kern,* 149 App. Div. 2d 187, 545 N. Y. S. 2d 4 (1989), aff'd, 75 N. Y. 2d 638, 555 N. Y. S. 2d 647 (1990); *State* v. *Alvarado,* 221 N. J. Super. 324, 534 A. 2d 440 (1987); *State* v. *Neil,* 457 So. 2d 481 (Fla. 1984); *Commonwealth* v. *Soares,* 377 Mass. 461, 387 N. E. 2d 499, cert. denied, 444 U. S. 881 (1979); *People* v. *Wheeler,* 22 Cal. 3d 258, 583 P. 2d 748 (1978).

Court in *Edmonson* used the analytical framework summarized in *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922 (1982).[7]

The first inquiry is "whether the claimed [constitutional] deprivation has resulted from the exercise of a right or privilege having its source in state authority." *Id.*, at 939. "There can be no question" that peremptory challenges satisfy this first requirement, as they "are permitted only when the government, by statute or decisional law, deems it appropriate to allow parties to exclude a given number of persons who otherwise would satisfy the requirements for service on the petit jury." *Edmonson*, 500 U. S., at 620. As in *Edmonson*, a Georgia defendant's right to exercise peremptory challenges and the scope of that right are established by a provision of state law. Ga. Code Ann. § 15–12–165 (1990).

The second inquiry is whether the private party charged with the deprivation can be described as a state actor. See *Lugar*, 457 U. S., at 941–942. In resolving that issue, the Court in *Edmonson* found it useful to apply three principles: (1) "the extent to which the actor relies on governmental assistance and benefits"; (2) "whether the actor is performing a traditional governmental function"; and (3) "whether the injury caused is aggravated in a unique way by the incidents of governmental authority." 500 U. S., at 621–622.

As to the first principle, the *Edmonson* Court found that the peremptory challenge system, as well as the jury system as a whole, "simply could not exist" without the "overt, significant participation of the government." *Id.*, at 622. Georgia provides for the compilation of jury lists by the board of jury commissioners in each county and establishes the general criteria for service and the sources for creating a pool of qualified jurors representing a fair cross section of the community. Ga. Code Ann. § 15–12–40. State law fur-

---

[7] The Court in *Lugar* held that a private litigant is appropriately characterized as a state actor when he "jointly participates" with state officials in securing the seizure of property in which the private party claims to have rights. 457 U. S., at 932–933, 941–942.

ther provides that jurors are to be selected by a specified process, § 15–12–42; they are to be summoned to court under the authority of the State, § 15–12–120; and they are to be paid an expense allowance by the State whether or not they serve on a jury, § 15–12–9. At court, potential jurors are placed in panels in order to facilitate examination by counsel, § 15–12–131; they are administered an oath, § 15–12–132; they are questioned on *voir dire* to determine whether they are impartial, § 15–12–164; and they are subject to challenge for cause, § 15–12–163.

In light of these procedures, the defendant in a Georgia criminal case relies on "governmental assistance and benefits" that are equivalent to those found in the civil context in *Edmonson*. "By enforcing a discriminatory peremptory challenge, the Court 'has . . . elected to place its power, property and prestige behind the [alleged] discrimination.'" *Edmonson*, 500 U. S., at 624 (citation omitted).

In regard to the second principle, the Court in *Edmonson* found that peremptory challenges perform a traditional function of the government: "Their sole purpose is to permit litigants to assist the government in the selection of an impartial trier of fact." *Id.*, at 620. And, as the *Edmonson* Court recognized, the jury system in turn "performs the critical governmental functions of guarding the rights of litigants and 'ensur[ing] continued acceptance of the laws by all of the people'" *Id.*, at 624 (citation omitted). These same conclusions apply with even greater force in the criminal context because the selection of a jury in a criminal case fulfills a unique and constitutionally compelled governmental function. Compare *Duncan* v. *Louisiana*, 391 U. S. 145 (1968) (making Sixth Amendment applicable to States through Fourteenth Amendment), with *Minneapolis & St. Louis R. Co.* v. *Bombolis*, 241 U. S. 211 (1916) (States do not have a constitutional obligation to provide a jury trial in civil cases). Cf. *West* v. *Atkins*, 487 U. S. 42, 53, n. 10, 57 (1988) (private

physician hired by State to provide medical care to prisoners was state actor because doctor was hired to fulfill State's constitutional obligation to attend to necessary medical care of prison inmates). The State cannot avoid its constitutional responsibilities by delegating a public function to private parties. Cf. *Terry* v. *Adams*, 345 U. S. 461 (1953) (private political party's determination of qualifications for primary voters held to constitute state action).

Finally, the *Edmonson* Court indicated that the courtroom setting in which the peremptory challenge is exercised intensifies the harmful effects of the private litigant's discriminatory act and contributes to its characterization as state action. These concerns are equally present in the context of a criminal trial. Regardless of who precipitated the jurors' removal, the perception and the reality in a criminal trial will be that the court has excused jurors based on race, an outcome that will be attributed to the State.[8]

Respondents nonetheless contend that the adversarial relationship between the defendant and the prosecution negates the governmental character of the peremptory challenge. Respondents rely on *Polk County* v. *Dodson*, 454 U. S. 312 (1981), in which a defendant sued, under 42 U. S. C. § 1983, the public defender who represented him. The defendant claimed that the public defender had violated his constitutional rights in failing to provide adequate representation. This Court determined that a public defender does not qualify as a state actor when engaged in his general representation of a criminal defendant.[9]

---

[8] Indeed, it is common practice not to reveal the identity of the challenging party to the jurors and potential jurors, thus enhancing the perception that it is the court that has rejected them. See Underwood, Ending Race Discrimination in Jury Selection: Whose Right Is It, Anyway?, 92 Colum. L. Rev. 725, 751, n. 117 (1992).

[9] Although *Polk County* determined whether or not the public defender's actions were under color of state law, as opposed to whether or not they constituted state action, this Court subsequently has held that the

*Polk County* did not hold that the adversarial relationship of a public defender with the State precludes a finding of state action—it held that this adversarial relationship prevented the attorney's public employment from *alone* being sufficient to support a finding of state action. Instead, the determination whether a public defender is a state actor for a particular purpose depends on the nature and context of the function he is performing. For example, in *Branti* v. *Finkel,* 445 U. S. 507 (1980), this Court held that a public defender, in making personnel decisions on behalf of the State, is a state actor who must comply with constitutional requirements. And the *Polk County* Court itself noted, without deciding, that a public defender may act under color of state law while performing certain administrative, and possibly investigative, functions. See 454 U. S., at 325.

The exercise of a peremptory challenge differs significantly from other actions taken in support of a defendant's defense. In exercising a peremptory challenge, a criminal defendant is wielding the power to choose a quintessential governmental body—indeed, the institution of government on which our judicial system depends. Thus, as we held in *Edmonson,* when "a government confers on a private body the power to choose the government's employees or officials, the private body will be bound by the constitutional mandate of race neutrality." 500 U. S., at 625.

Lastly, the fact that a defendant exercises a peremptory challenge to further his interest in acquittal does not conflict with a finding of state action. Whenever a private actor's conduct is deemed "fairly attributable" to the government, it is likely that private motives will have animated the actor's decision. Indeed, in *Edmonson,* the Court recognized that the private party's exercise of peremptory challenges consti-

---

two inquiries are the same, see, *e. g., Rendell-Baker* v. *Kohn,* 457 U. S. 830, 838 (1982), and has specifically extended *Polk County*'s reasoning to state-action cases, see *Blum* v. *Yaretsky,* 457 U. S. 991, 1009, n. 20 (1982).

tuted state action, even though the motive underlying the exercise of the peremptory challenge may be to protect a private interest. See *id.*, at 626.[10]

## C

Having held that a defendant's discriminatory exercise of a peremptory challenge is a violation of equal protection, we move to the question whether the State has standing to challenge a defendant's discriminatory use of peremptory challenges. In *Powers*, 499 U. S., at 416, this Court held that a white criminal defendant has standing to raise the equal protection rights of black jurors wrongfully excluded from jury service. While third-party standing is a limited exception, the *Powers* Court recognized that a litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he has suffered a concrete injury, that he has a close relation to the third party, and that there exists some hindrance to the third party's ability to protect its own interests. *Id.*, at 411. In *Edmonson*, the Court applied the same analysis in deciding that civil litigants had standing to raise the equal protection rights of jurors excluded on the basis of their race.

In applying the first prong of its standing analysis, the *Powers* Court found that a criminal defendant suffered cog-

---

[10] Numerous commentators similarly have concluded that a defendant's exercise of peremptory challenges constitutes state action. See generally Alschuler, The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, 56 U. Chi. L. Rev. 153, 197–198 (1989); Note, State Action and the Peremptory Challenge: Evolution of the Court's Treatment and Implications for *Georgia v. McCollum*, 67 Notre Dame L. Rev. 1049, 1061–1074 (1992); Note, Discrimination by the Defense: Peremptory Challeges after *Batson v. Kentucky*, 88 Colum. L. Rev. 355, 358–361 (1988); Comment, The Prosecutor's Right to Object to a Defendant's Abuse of Peremptory Challenges, 93 Dick. L. Rev. 143, 158–162 (1988); Tanford, Racism in the Adversary System: The Defendant's Use of Peremptory Challenges, 63 S. Cal. L. Rev. 1015, 1027–1030 (1990); Underwood, 92 Colum. L. Rev., at 750–753.

nizable injury "because racial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' and places the fairness of a criminal proceeding in doubt." 499 U. S., at 411 (citation omitted). In *Edmonson*, this Court found that these harms were not limited to the criminal sphere. 500 U. S., at 630. Surely, a State suffers a similar injury when the fairness and integrity of its own judicial process is undermined.

In applying the second prong of its standing analysis, the *Powers* Court held that *voir dire* permits a defendant to "establish a relation, if not a bond of trust, with the jurors," a relation that "continues throughout the entire trial." 499 U. S., at 413. "Exclusion of a juror on the basis of race severs that relation in an invidious way." *Edmonson*, 500 U. S., at 629.

The State's relation to potential jurors in this case is closer than the relationships approved in *Powers* and *Edmonson*. As the representative of all its citizens, the State is the logical and proper party to assert the invasion of the constitutional rights of the excluded jurors in a criminal trial. Indeed, the Fourteenth Amendment forbids the State to deny persons within its jurisdiction the equal protection of the laws.

In applying the final prong of its standing analysis, the *Powers* Court recognized that, although individuals excluded from jury service on the basis of race have a right to bring suit on their own behalf, the "barriers to a suit by an excluded juror are daunting." 499 U. S., at 414. See also *Edmonson*, 500 U. S., at 629. The barriers are no less formidable in this context. See Note, Discrimination by the Defense: Peremptory Challenges after *Batson v. Kentucky*, 88 Colum. L. Rev. 355, 367 (1988); Underwood, 92 Colum. L. Rev., at 757 (summarizing barriers to suit by excluded juror). Accordingly, we hold that the State has standing to assert the excluded jurors' rights.

## D

The final question is whether the interests served by *Batson* must give way to the rights of a criminal defendant. As a preliminary matter, it is important to recall that peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial. This Court repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial. See *Frazier* v. *United States*, 335 U. S. 497, 505, n. 11 (1948); *United States* v. *Wood*, 299 U. S. 123, 145 (1936); *Stilson* v. *United States*, 250 U. S. 583, 586 (1919); see also *Swain*, 380 U. S., at 219.

Yet in *Swain*, the Court reviewed the "very old credentials," *id.*, at 212, of the peremptory challenge and noted the "long and widely held belief that the peremptory challenge is a necessary part of trial by jury," *id.*, at 219; see *id.*, at 212–219. This Court likewise has recognized that "the role of litigants in determining the jury's composition provides one reason for wide acceptance of the jury system and of its verdicts." *Edmonson*, 500 U. S., at 630.

We do not believe that this decision will undermine the contribution of the peremptory challenge to the administration of justice. Nonetheless, "if race stereotypes are the price for acceptance of a jury panel as fair," we reaffirm today that such a "price is too high to meet the standard of the Constitution." *Id.*, at 630. Defense counsel is limited to "legitimate, lawful conduct." *Nix* v. *Whiteside*, 475 U. S. 157, 166 (1986) (defense counsel does not render ineffective assistance when he informs his client that he would disclose the client's perjury to the court and move to withdraw from representation). It is an affront to justice to argue that a fair trial includes the right to discriminate against a group of citizens based upon their race.

58

Nor does a prohibition of the exercise of discriminatory peremptory challenges violate a defendant's Sixth Amendment right to the effective assistance of counsel. Counsel can ordinarily explain the reasons for peremptory challenges without revealing anything about trial strategy or any confidential client communications. In the rare case in which the explanation for a challenge would entail confidential communications or reveal trial strategy, an *in camera* discussion can be arranged. See *United States* v. *Zolin,* 491 U. S. 554 (1989); cf. *Batson,* 476 U. S., at 97 (expressing confidence that trial judges can develop procedures to implement the Court's holding). In any event, neither the Sixth Amendment right nor the attorney-client privilege gives a criminal defendant the right to carry out through counsel an unlawful course of conduct. See *Nix,* 475 U. S., at 166; *Zolin,* 491 U. S., at 562–563. See Swift, Defendants, Racism and the Peremptory Challenge, 22 Colum. Hum. Rights L. Rev. 177, 207–208 (1991).

Lastly, a prohibition of the discriminatory exercise of peremptory challenges does not violate a defendant's Sixth Amendment right to a trial by an impartial jury. The goal of the Sixth Amendment is "jury impartiality with respect to both contestants." *Holland* v. *Illinois,* 493 U. S. 474, 483 (1990). See also *Hayes* v. *Missouri,* 120 U. S. 68 (1887).

We recognize, of course, that a defendant has the right to an impartial jury that can view him without racial animus, which so long has distorted our system of criminal justice. We have, accordingly, held that there should be a mechanism for removing those on the venire whom the defendant has specific reason to believe would be incapable of confronting and suppressing their racism. See *Ham* v. *South Carolina,* 409 U. S. 524, 526–527 (1973); *Rosales-Lopez* v. *United States,* 451 U. S. 182, 189–190 (1981) (plurality opinion of WHITE, J.). Cf. *Morgan* v. *Illinois,* 504 U. S. 719 (1992) (exclusion of juror in capital trial is permissible upon showing that juror is incapable of considering sentences other than death).

But there is a distinction between exercising a peremptory challenge to discriminate invidiously against jurors on account of race and exercising a peremptory challenge to remove an individual juror who harbors racial prejudice. This Court firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror. As this Court stated just last Term in *Powers*, "[w]e may not accept as a defense to racial discrimination the very stereotype the law condemns." 499 U. S., at 410. "In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion." *Ristaino* v. *Ross*, 424 U. S. 589, 596, n. 8 (1976). We therefore reaffirm today that the exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party.

## IV

We hold that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges. The judgment of the Supreme Court of Georgia is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, concurring.

I was in dissent in *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614 (1991), and continue to believe that case to have been wrongly decided. But so long as it remains the law, I believe that it controls the disposition of this case on the

issue of "state action" under the Fourteenth Amendment. I therefore join the opinion of the Court.

JUSTICE THOMAS, concurring in the judgment.

As a matter of first impression, I think that I would have shared the view of the dissenting opinions: A criminal defendant's use of peremptory strikes cannot violate the Fourteenth Amendment because it does not involve state action. Yet, I agree with the Court and THE CHIEF JUSTICE that our decision last Term in *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614 (1991), governs this case and requires the opposite conclusion. Because the respondents do not question *Edmonson*, I believe that we must accept its consequences. I therefore concur in the judgment reversing the Georgia Supreme Court.

I write separately to express my general dissatisfaction with our continuing attempts to use the Constitution to regulate peremptory challenges. See, *e. g.*, *Batson* v. *Kentucky*, 476 U. S. 79 (1986); *Powers* v. *Ohio*, 499 U. S. 400 (1991); *Edmonson, supra.* In my view, by restricting a criminal defendant's use of such challenges, this case takes us further from the reasoning and the result of *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). I doubt that this departure will produce favorable consequences. On the contrary, I am certain that black criminal defendants will rue the day that this Court ventured down this road that inexorably will lead to the elimination of peremptory strikes.

In *Strauder*, as the Court notes, we invalidated a state law that prohibited blacks from serving on juries. In the course of the decision, we observed that the racial composition of a jury may affect the outcome of a criminal case. We explained: "It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy." *Id.*, at 309. We thus recog-

nized, over a century ago, the precise point that JUSTICE O'CONNOR makes today. Simply stated, securing representation of the defendant's race on the jury may help to overcome racial bias and provide the defendant with a better chance of having a fair trial. *Post*, at 68–69.

I do not think that this basic premise of *Strauder* has become obsolete. The public, in general, continues to believe that the makeup of juries can matter in certain instances. Consider, for example, how the press reports criminal trials. Major newspapers regularly note the number of whites and blacks that sit on juries in important cases.[1] Their editors and readers apparently recognize that conscious and unconscious prejudice persists in our society and that it may influence some juries. Common experience and common sense confirm this understanding.

In *Batson*, however, this Court began to depart from *Strauder* by holding that, without some actual showing, suppositions about the possibility that jurors may harbor prejudice have no legitimacy. We said, in particular, that a prosecutor could not justify peremptory strikes "by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." 476 U. S., at 97. As noted, however, our decision in *Strauder* rested on precisely such an "assumption" or "intuition." We reasonably surmised, without direct evidence in any particular case, that all-white juries might judge black defendants unfairly.

Our departure from *Strauder* has two negative consequences. First, it produces a serious misordering of our priorities. In *Strauder*, we put the rights of defendants foremost. Today's decision, while protecting jurors, leaves defendants with less means of protecting themselves. Un-

---

[1] A computer search, for instance, reveals that the phrase "all white jury" has appeared over 200 times in the past five years in the New York Times, Chicago Tribune, and Los Angeles Times.

less jurors actually admit prejudice during *voir dire*, defendants generally must allow them to sit and run the risk that racial animus will affect the verdict. Cf. Fed. Rule Evid. 606(b) (generally excluding juror testimony after trial to impeach the verdict). In effect, we have exalted the right of citizens to sit on juries over the rights of the criminal defendant, even though it is the defendant, not the jurors, who faces imprisonment or even death. At a minimum, I think that this inversion of priorities should give us pause.

Second, our departure from *Strauder* has taken us down a slope of inquiry that had no clear stopping point. Today, we decide only that white defendants may not strike black veniremen on the basis of race. Eventually, we will have to decide whether black defendants may strike white veniremen.[2] See, *e. g., State* v. *Carr*, 261 Ga. 845, 413 S. E. 2d 192 (1992). Next will come the question whether defendants may exercise peremptories on the basis of sex. See, *e. g., United States* v. *De Gross*, 960 F. 2d 1433 (CA9 1992). The consequences for defendants of our decision and of these future cases remain to be seen. But whatever the benefits were that this Court perceived in a criminal defendant's having members of his class on the jury, see *Strauder*, 100 U. S., at 309–310, they have evaporated.

JUSTICE O'CONNOR, dissenting.

The Court reaches the remarkable conclusion that criminal defendants being prosecuted by the State act on behalf of their adversary when they exercise peremptory challenges during jury selection. The Court purports merely to follow

---

[2] The NAACP Legal Defense and Educational Fund, Inc., has submitted a brief arguing, in all sincerity, that "whether white defendants can use peremptory challenges to purge minority jurors presents quite different issues from whether a minority defendant can strike majority group jurors." Brief for NAACP Legal Defense and Educational Fund, Inc., as *Amicus Curiae* 3–4. Although I suppose that this issue technically remains open, it is difficult to see how the result could be different if the defendants here were black.

precedents, but our cases do not compel this perverse result. To the contrary, our decisions specifically establish that criminal defendants and their lawyers are not government actors when they perform traditional trial functions.

## I

It is well and properly settled that the Constitution's equal protection guarantee forbids prosecutors to exercise peremptory challenges in a racially discriminatory fashion. See *Batson* v. *Kentucky*, 476 U. S. 79 (1986); *Powers* v. *Ohio*, 499 U. S. 400, 409 (1991). The Constitution, however, affords no similar protection against private action. "Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendmen[t] . . . , and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be." *National Collegiate Athletic Assn.* v. *Tarkanian*, 488 U. S. 179, 191 (1988) (footnote omitted). This distinction appears on the face of the Fourteenth Amendment, which provides that "*No State* shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, § 1 (emphasis added). The critical but straightforward question this case presents is whether criminal defendants and their lawyers, when exercising peremptory challenges as part of a defense, are state actors.

In *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922 (1982), the Court developed a two-step approach to identifying state action in cases such as this. First, the Court will ask "whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority." *Id.*, at 939. Next, it will decide whether, on the particular facts at issue, the parties who allegedly caused the deprivation of a federal right can "appropriately" and "in all fairness" be characterized as state actors. *Ibid.; Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 620 (1991). The

Court's determination in this case that the peremptory challenge is a creation of state authority, *ante*, at 51, breaks no new ground. See *Edmonson, supra,* at 620–621. But disposing of this threshold matter leaves the Court with the task of showing that criminal defendants who exercise peremptories should be deemed governmental actors. What our cases require, and what the Court neglects, is a realistic appraisal of the relationship between defendants and the government that has brought them to trial.

We discussed that relationship in *Polk County* v. *Dodson,* 454 U. S. 312 (1981), which held that a public defender does not act "under color of state law" for purposes of 42 U. S. C. § 1983 "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." 454 U. S., at 325. We began our analysis by explaining that a public defender's obligations toward her client are no different than the obligations of any other defense attorney. *Id.,* at 318. These obligations preclude attributing the acts of defense lawyers to the State: "[T]he duties of a defense lawyer are those of a personal counselor and advocate. It is often said that lawyers are 'officers of the court.' But the Courts of Appeals are agreed that a lawyer representing a client is not, by virtue of being an officer of the court, a state actor . . . ." *Ibid.*

We went on to stress the inconsistency between our adversarial system of justice and theories that would make defense lawyers state actors. "In our system," we said, "a defense lawyer characteristically opposes the designated representatives of the State." *Ibid.* This adversarial posture rests on the assumption that a defense lawyer best serves the public "not by acting on behalf of the State or in concert with it, but rather by advancing 'the undivided interests of his client.'" *Id.,* at 318–319 (quoting *Ferri* v. *Ackerman,* 444 U. S. 193, 204 (1979)). Moreover, we pointed out that the independence of defense attorneys from state control has a constitutional dimension. *Gideon* v. *Wainwright,*

372 U. S. 335 (1963), "established the right of state criminal defendants to the guiding hand of counsel at every step in the proceedings against [them]." 454 U. S., at 322 (internal quotation marks omitted). Implicit in this right "is the assumption that counsel will be free of state control. There can be no fair trial unless the accused receives the services of an effective and independent advocate." *Ibid.* Thus, the defense's freedom from state authority is not just empirically true, but is a constitutionally mandated attribute of our adversarial system.

Because this Court deems the "under color of state law" requirement that was not satisfied in *Dodson* identical to the Fourteenth Amendment's state action requirement, see *Lugar, supra,* at 929, the holding of *Dodson* simply cannot be squared with today's decision. In particular, *Dodson* cannot be explained away as a case concerned exclusively with the employment status of public defenders. See *ante,* at 54. The *Dodson* Court reasoned that public defenders performing traditional defense functions are not state actors because they occupy the same position as other defense attorneys in relevant respects. 454 U. S., at 319–325. This reasoning followed on the heels of a critical determination: Defending an accused "is essentially a private function," not state action. *Id.,* at 319. The Court's refusal to acknowledge *Dodson*'s initial holding, on which the entire opinion turned, will not make that holding go away.

The Court also seeks to evade *Dodson*'s logic by spinning out a theory that defendants and their lawyers transmogrify from government adversaries into state actors when they exercise a peremptory challenge, and then change back to perform other defense functions. See *ante,* at 54. *Dodson,* however, established that even though public defenders might act under color of state law when carrying out administrative or investigative functions outside a courtroom, they are not vested with state authority "when performing a lawyer's traditional functions as counsel to a defendant in a

criminal proceeding." 454 U. S., at 325. Since making peremptory challenges plainly qualifies as a "traditional function" of criminal defense lawyers, see *Swain* v. *Alabama*, 380 U. S. 202, 212–219 (1965); *Lewis* v. *United States*, 146 U. S. 370, 376 (1892), *Dodson* forecloses the Court's functional analysis.

Even aside from our prior rejection of it, the Court's functional theory fails. "[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement . . . that the choice must in law be deemed to be that of the State." *Blum* v. *Yaretsky*, 457 U. S. 991, 1004 (1982). Thus, a private party's exercise of choice allowed by state law does not amount to state action for purposes of the Fourteenth Amendment so long as "the initiative comes from [the private party] and not from the State." *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 357 (1974). See *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 165 (1978) (State not responsible for a decision it "permits but does not compel"). The government in no way influences the defense's decision to use a peremptory challenge to strike a particular juror. Our adversarial system of criminal justice and the traditions of the peremptory challenge vest the decision to strike a juror entirely with the accused. A defendant "may, if he chooses, peremptorily challenge 'on his own dislike, without showing any cause;' he may exercise that right without reason or for no reason, arbitrarily and capriciously." *Pointer* v. *United States*, 151 U. S. 396, 408 (1894) (quoting 1 E. Coke, Institutes 156b (19th ed. 1832)). "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." *Swain, supra,* at 220. See *Dodson, supra,* at 321–322; *Lewis, supra,* at 376, 378.

Certainly, *Edmonson* v. *Leesville Concrete Co.* did not render *Dodson* and its realistic approach to the state action inquiry dead letters. The *Edmonson* Court distinguished

*Dodson* by saying: "In the ordinary context of civil litigation in which the government is not a party, an adversarial relation does not exist between the government and a private litigant. In the jury selection process, the government and private litigants work for the same end." *Edmonson*, 500 U. S., at 627. While the nonpartisan administrative interests of the State and the partisan interests of private litigants may not be at odds during civil jury selection, the same cannot be said of the partisan interests of the State and the defendant during jury selection in a criminal trial. A private civil litigant opposes a private counterpart, but a criminal defendant is by design in an adversarial relationship with the government. Simply put, the defendant seeks to strike jurors predisposed to convict, while the State seeks to strike jurors predisposed to acquit. The *Edmonson* Court clearly recognized this point when it limited the statement that "an adversarial relation does not exist between the government and a private litigant" to "the ordinary context of *civil litigation in which the government is not a party*." *Ibid.* (emphasis added).

From arrest, to trial, to possible sentencing and punishment, the antagonistic relationship between government and the accused is clear for all to see. Rather than squarely facing this fact, the Court, as in *Edmonson*, rests its finding of governmental action on the points that defendants exercise peremptory challenges in a courtroom and judges alter the composition of the jury in response to defendants' choices. I found this approach wanting in the context of civil controversies between private litigants, for reasons that need not be repeated here. See *id.*, at 632 (O'CONNOR, J., dissenting). But even if I thought *Edmonson* was correctly decided, I could not accept today's simplistic extension of it. *Dodson* makes clear that the unique relationship between criminal defendants and the State precludes attributing defendants' actions to the State, whatever is the case in civil trials. How could it be otherwise when the underlying question is

whether the accused "c[an] be described in all fairness as a state actor"? 500 U. S., at 620. As *Dodson* accords with our state action jurisprudence and with common sense, I would honor it.

## II

What really seems to bother the Court is the prospect that leaving criminal defendants and their attorneys free to make racially motivated peremptory challenges will undermine the ideal of nondiscriminatory jury selection we espoused in *Batson*, 476 U. S., at 85–88. The concept that the government alone must honor constitutional dictates, however, is a fundamental tenet of our legal order, not an obstacle to be circumvented. This is particularly so in the context of criminal trials, where we have held the prosecution to uniquely high standards of conduct. See *Brady* v. *Maryland*, 373 U. S. 83 (1963) (disclosure of evidence favorable to the accused); *Berger* v. *United States*, 295 U. S. 78, 88 (1935) ("The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done").

Considered in purely pragmatic terms, moreover, the Court's holding may fail to advance nondiscriminatory criminal justice. It is by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence. See Developments in the Law—Race and the Criminal Process, 101 Harv. L. Rev. 1472, 1559–1560 (1988); Colbert, Challenging the Challenge: Thirteenth Amendment as a Prohibition against the Racial Use of Peremptory Challenges, 76 Cornell L. Rev. 1, 110–112 (1990). Using peremptory challenges to secure minority representation on the jury may help to overcome such racial bias, for there is substantial reason to believe that the distorting influence of race is minimized on a racially mixed jury. See *id.*, at 112–115; Developments in

the Law, *supra,* at 1559–1560. As *amicus* NAACP Legal Defense and Educational Fund explained in this case:

> "The ability to use peremptory challenges to exclude majority race jurors may be crucial to empaneling a fair jury. In many cases an African American, or other minority defendant, may be faced with a jury array in which his racial group is underrepresented to some degree, but not sufficiently to permit challenge under the Fourteenth Amendment. The only possible chance the defendant may have of having any minority jurors on the jury that actually tries him will be if he uses his peremptories to strike members of the majority race." Brief for NAACP Legal Defense and Educational Fund, Inc., as *Amicus Curiae* 9–10 (footnote omitted).

See Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 56–57; *Edmonson, supra,* at 644 (SCALIA, J., dissenting). In a world where the outcome of a minority defendant's trial may turn on the misconceptions or biases of white jurors, there is cause to question the implications of this Court's good intentions.

That the Constitution does not give federal judges the reach to wipe all marks of racism from every courtroom in the land is frustrating, to be sure. But such limitations are the necessary and intended consequence of the Fourteenth Amendment's state action requirement. Because I cannot accept the Court's conclusion that government is responsible for decisions criminal defendants make while fighting state prosecution, I respectfully dissent.

JUSTICE SCALIA, dissenting.

I agree with the Court that its judgment follows logically from *Edmonson* v. *Leesville Concrete Co.,* 500 U. S. 614 (1991). For the reasons given in the *Edmonson* dissents, however, I think that case was wrongly decided. Barely a year later, we witness its reduction to the terminally absurd:

A criminal defendant, in the process of defending himself against the state, is held to be acting on behalf of the state. JUSTICE O'CONNOR demonstrates the sheer inanity of this proposition (in case the mere statement of it does not suffice), and the contrived nature of the Court's justifications. I see no need to add to her discussion, and differ from her views only in that I do not consider *Edmonson* distinguishable in principle—except in the principle that a bad decision should not be followed logically to its illogical conclusion.

Today's decision gives the lie once again to the belief that an activist, "evolutionary" constitutional jurisprudence always evolves in the direction of greater individual rights. In the interest of promoting the supposedly greater good of race relations in the society as a whole (make no mistake that that is what underlies all of this), we use the Constitution to destroy the ages-old right of criminal defendants to exercise peremptory challenges as they wish, to secure a jury that they consider fair. I dissent.