**Brian COX, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee, at Jackson.

Jan. 5, 1994.

Permission to Appeal Denied by Supreme Court May 16, 1994.

David R. Crichton, Bolivar, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Rose Mary Drake, Crim. Justice Div., Nashville, John W. Pierotti, Dist. Atty. Gen., Jamey Kaplan, Asst. Dist. Atty. Gen., Memphis, for appellee.

## OPINION

SUMMERS, Judge.

Appellant, Brian Cox, appeals to this Court as of right from the denial of his petition for post-conviction relief. The Honorable L.T. Lafferty, Judge of Division II of the Shelby County Criminal Court, presided. Having considered the thorough findings of fact and conclusions of law by the hearing judge as well as the excellent arguments by both sides, we affirm the judgment below.

The crimes for which appellant was originally convicted occurred on April 2, 1988. He was charged with the capital murders of three women. He was also indicted for assault with intent to commit first-degree murder on an eleven-year-old child. As to two of the murder victims, Janice Allen and Pamela Allen, appellant was indicted for murder during the perpetration of a rape as well as premeditated murder. As to the third victim, Fannie Hall, appellant was indicted for premeditated murder only. The child victim's name was Kevin Allen.

After a vigorously litigated trial, the jury found appellant guilty of three counts of premeditated first-degree murder and assault with intent to commit first-degree murder. The jury sentenced appellant to life imprisonment on each count of murder. In a separate sentencing hearing, the judge sentenced appellant to twenty-five years on the assault charge. The court ordered two of the life sentences and the twenty-five-year sentence to be served consecutively. The remaining

life sentence was to run concurrently with the other sentences.

After appellant's convictions, he appealed to this Court which affirmed his convictions and sentence as adjudged in all respects. *State v. Cox*, C.C.A. No. 18, 1991 WL 35753 (Tenn.Crim.App., Jackson, March 20, 1991). The Tennessee Supreme Court denied appellant's application for permission to appeal on August 5, 1991.

Appellant was represented at trial by two experienced attorneys appointed by the trial court. A separate assistant public defender represented appellant on appeal. Presently, a fourth attorney, appointed by the hearing court, represents appellant during these post-conviction relief proceedings.

Appellant filed his petition for post-conviction relief in 1992. He was given an exhaustive hearing by the court, and several witnesses were called, including one of appellant's previous attorneys at trial. The hearing court denied any relief for appellant. On appeal, he is asking us to set aside his convictions due to ineffective assistance of counsel. His ineffective assistance argument is divided into two parts:

1. Whether his former counsel violated the Equal Protection Clauses of the United States and Tennessee Constitutions by engaging in purposeful discrimination by using all available peremptory challenges to exclude jurors on account of their race.

2. Whether his former counsel performed inadequately by not investigating the case properly before trial.

Because of the issues presented and the arguments in support thereof, we believe that a recitation of the facts of the crimes would be helpful.

### TRIAL FACTS

Gail Byrd was the first witness to testify for the state at trial. Ms. Byrd was the older sister of two of the victims, Pamela Allen and Janice Allen. The third victim, Fannie Hall, was the mother of all three women. Janice Allen was Kevin Allen's mother.

On the morning of April 2, 1988, Ms. Byrd went to the apartment where her mother and other family members were temporarily staying. Looking into the apartment, she saw a child crying. She was unable to gain entrance to the apartment, so she called the police from a neighbor's home. A cab driver, who had taken Ms. Byrd to her mother's home, saw a man running down the driveway from the building. This man had a dark complexion. His shirt had red color speckled primarily on the shoulders, and he was wrapping his arms with something as he fled.

An officer of the Memphis Police Department testified that when he entered the apartment, he saw Kevin Allen who, although alive and conscious, had been repeatedly stabbed. He saw a woman, Janice Allen, lying halfway on the couch and halfway on the floor of the living room. She was dead. An officer found an older woman, Fannie Hall, lying next to Kevin Allen. She was alive. In the back bedroom an officer found Pamela Allen on the floor, bound, stabbed, and apparently dead.

A crime scene officer at trial testified that the handle from a skillet, admitted into evidence, was found in the living room of the apartment. The pan part of the skillet was located in the bedroom where Pamela Allen's body was found. Also located in the bedroom, close to the body of Pamela Allen, was a plastic water jug and a drinking glass. Investigators retrieved latent fingerprints from several of the items found at the crime scene, including the drinking glass and an ashtray located in the living room.

The evidence at trial showed that the two younger women died from multiple stab wounds at the crime scene. Ms. Fannie Allen died approximately twenty-three days later from complications resulting from stab wounds. Fortunately, Kevin Allen survived and later testified at trial.

Appellant's girlfriend testified at trial on behalf of the state. She saw appellant on the previous evening, April 1, 1988, at about 12:00 noon. The next time she saw him was when he arrived at her home at about 10:15 a.m. on April 2, 1988. He had blood on his pants, and his shirt was pulled over his head. He had a fresh cut on his arm. Appellant told her that he had been robbed on the way

to her house. He changed clothes, put the shirt and pants in a bag, and placed the bag in a garbage dumpster outside of their residence.

There was much testimony at trial about blood grouping, forensic medicine, and forensic serology. Blood samples were lifted from around the back door and the kitchen floor of the crime scene. The blood was compared to the blood of appellant. His blood grouping was consistent with the samples from the kitchen area.

A latent fingerprint examiner testified regarding compared samples of inked prints of appellant and latent prints taken from the crime scene. The latent prints found on a drinking glass and an ashtray matched appellant's fingerprints.

A key witness at the trial was Kevin Allen. He testified that he went to sleep at about 10:30 p.m. on the night before the murders. He remembered being awakened by appellant, Brian Cox, who grabbed his mouth and forced him to the bedroom. Pamela Allen, Kevin's aunt, was also in the bedroom. He witnessed appellant hit Pamela Allen over the head with a skillet.

While in the bedroom, Kevin heard something that sounded like his mother had been hit with a skillet. He heard his mother asking appellant why he was treating everyone so cruelly. Appellant then called Pamela Allen and Janice Allen into the living room. When he brought Pamela Allen back to the bedroom, she was naked and bound.

Kevin went into the living room where he saw his mother. She told Kevin to cooperate with appellant. Appellant took Kevin back to the bedroom where he tied his hands and legs.

Pamela Allen, who was in the bedroom with Kevin, asked appellant for some water. Appellant brought a water jug and a water glass to her. He poured water into the glass, and he allowed Pamela Allen to drink the water as he held the glass to her lips.

Kevin then hopped into the living room. He saw his mother naked, gagged, and bound. He also saw appellant sitting in a chair in the living room smoking a cigarette. Kevin returned to the bedroom.

The next major event occurred when Gail Byrd knocked on the door. After Ms. Byrd announced that she was going to call the police, appellant began "stabbing everybody in the house." Kevin, peering around the corner, witnessed his mother being viciously stabbed.

Appellant entered the bedroom and stabbed Pamela Allen. Appellant was holding his hand, apparently having been hurt in some manner. Appellant then stabbed Kevin and ran out the back door.

In his direct testimony, Kevin explained that he had originally identified a Reginald Wilkerson as the individual who committed the crimes in question. He testified that while he was in the hospital, he selected Wilkerson from a photograph because Wilkerson was the only person whom he recognized in the picture. He later recanted this to the police.

Appellant denied stabbing any of the victims. He testified that the day before the crime he was accosted by a man who cut his arm with a knife and stole six dollars. Later, he went to his sister's apartment which was next door to the crime scene. He admitted that he visited with Ms. Hall in her home, placing himself at the crime scene. He stated that he took out the garbage for Ms. Hall and in the process cut his arm again.

At trial, appellant tried to infer that Reginald Wilkerson was responsible for the crimes. He also relied on alibi. He attempted to point out inconsistencies in what the eyewitness had testified. He related these inconsistencies to the plausibility of Wilkerson being the culprit. His basic defense was that the eyewitness identification was suspect, and Reginald Wilkerson had a motive for committing the crimes. The jury did not believe appellant's defense and convicted him of the charges for which he is now seeking collateral relief.

## THE POST–CONVICTION RELIEF HEARING

Appellant testified that he did not remember talking to his appointed counsel until several weeks after his arrest in April 1988.

He also testified that no one from his defense team spoke with or interviewed Fannie Hall before she died. He believes that Fannie Hall could have cleared him of the crimes for which he was charged and later convicted.

Appellant complained at the hearing that defense counsel failed to perform blood tests on Reginald Wilkerson. He contends that a blood test would show that Wilkerson's blood type matched the blood at the scene of the crime. He also complained that no tests were performed on the knife and gun found at Wilkerson's residence. He stated that his brother, Daryl, had helpful information relating to his case; however, counsel only used Daryl Cox to testify at the sentencing hearing.

Appellant admitted on cross-examination that he did not pressure his lawyers to talk with Fannie Hall. He also admitted that he did not know whether the police had spoken with her before she died.

One of the lawyers who represented appellant testified at the hearing. At the time of his testimony, he had been a member of the Capital Defense Team for thirteen years. The lawyer, Robert Jones, spoke in detail about the jury selection procedures at the capital trial of appellant. He admitted that counsel "probably did" excuse fifteen white potential jurors because it was believed that black jurors, being of the same race as the appellant, were better jurors for the defense. Mr. Jones testified that he talked to and questioned each juror in the case. He further testified that he did not excuse jurors solely on the basis of race, or that race was the main concern in the jury selection.

Mr. Jones also testified about the procedures in the public defender's office concerning the interviewing of witnesses. An investigator would initially interview the witnesses, and then would direct Mr. Jones to those witnesses that he personally needed to interview.

Concerning the failure to interview Fannie Hall, Mr. Jones stated that he understood that she could not speak and could give no statement. Furthermore, she died unexpectedly as a result of the stabbings. To his knowledge, the police also had no statement from Fannie Hall.

Mr. Jones also testified that his record showed that the public defender's office was appointed to represent the appellant on April 11, 1988, and that he had an extensive interview with him on April 12, 1988. He further testified that he talked to Reginald Wilkerson regarding the crimes and he realized that Wilkerson had been in a fight with a member of Fannie Hall's family. He also knew that Wilkerson had made some threats against the family. Mr. Jones explained that a strategic decision was made not to ask for a blood test on Wilkerson. It was a difficult decision because if the evidence cleared Wilkerson, it would, in fact, harm the appellant's case. Mr. Jones also stated that he was aware of a knife and a gun found at the residence of Wilkerson at the time of his arrest and that he did not request a test on these items for the same reason.

## INEFFECTIVE ASSISTANCE
## OF COUNSEL

▆▆▆ The appropriate test for determining whether counsel provided effective assistance at trial is whether his or her performance was within the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose,* 523 S.W.2d 930 (Tenn.1975). Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), there is a two-prong test which places the burden on the appellant to show that (1) the representation was deficient, requiring a showing that counsel made errors so serious that she or he was not functioning as "counsel" as guaranteed a defendant by the Sixth Amendment, and (2) the deficient representation prejudiced the defense to the point of depriving the defendant of a fair trial with a reliable result. To succeed on his claim, the appellant must show that there is a "reasonable probability," which is a probability sufficient to undermine confidence in the outcome that, but for the counsel's unprofessional errors, the results of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. The burden rests on the appellant to prove his allegations by a preponderance of the evidence. *Long v. State,* 510 S.W.2d 83,

86 (Tenn.Crim.App.1974). We also do not use the benefit of hindsight to second-guess trial strategy by counsel and criticize counsel's tactics. *State v. Martin,* 627 S.W.2d 139, 142 (Tenn.Crim.App.1981).

Appellant argues that he should be granted a new trial because his counsel discriminated against white jurors in the jury selection process. He was tried and convicted in 1989, and on the basis of *Georgia v. McCollum,* — U.S. —, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), he believes that he should be given a new trial. We respectfully disagree.

*McCollum* was an extension of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which held that a defendant may challenge the prosecution's use of peremptory challenges dismissing blacks from the jury. Under *Batson,* a defendant could establish a prima facie case of purposeful discrimination by showing that he or she is a member of a "cognizable racial group," that the prosecutor had exercised peremptory challenges to remove from the venire members of the defendant's race, and that the facts and any other relevant circumstances raise an inference that the prosecutor excluded potential jurors on the basis of race. *Id.* at 96, 106 S.Ct. at 1722–23. In sum, *Batson,* concluded that the Constitution's equal protection guarantee forbids prosecutors from exercising peremptory challenges in a racially discriminatory manner.

The Supreme Court modified *Batson* in two subsequent decisions. First, *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) gave retroactive application to *Batson* in those cases pending on direct review or not yet final at the time of the *Batson* decision. Then, in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the United States Supreme Court held that in the criminal trial of a white defendant, a prosecutor may not exclude African–American jurors on the basis of race. The Court thus eliminated the requirement that a defendant and any wrong-fully excluded jurors must be of the same race. It reasoned that "*Batson* 'was designed to serve multiple ends,' only one of which was to protect individual defendants from discrimination in the jury selection process." *Id.* 499 U.S. at 406, 111 S.Ct. at 1368. Consequently, while the defendant in *Powers* was not necessarily denied equal protection when prospective jurors of another race were excluded from service, those improperly excluded jurors were victims of racial discrimination, and the defendant had third-party standing to raise the equal protection rights of the excluded jurors.

In *Georgia v. McCollum,*[1] the State of Georgia challenged the defendants' use of peremptory challenges in a racially discriminatory manner. The defendants in *McCollum,* who were white, were charged with assaulting two African–Americans. Before the jury was selected, the trial court denied the prosecutor's motion to prohibit the defendants from exercising peremptory challenges in a manner that was racially discriminatory. The Georgia Supreme Court affirmed the trial court. The United States Supreme Court reversed, holding that the Constitution prohibits a defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. *McCollum,* — U.S. at —, 112 S.Ct. at 2359. The Court explained that, similar to *Powers,* "the extension of *Batson* in this context is designed to remedy the harm done to the 'dignity of persons' and to the 'integrity of the courts.'" *Id.* at —, 112 S.Ct. at 2353. The Court further noted that discriminatory selection procedures undermine "[p]ublic confidence in the integrity of the criminal justice system...." *Id.* Thus, regardless of who invokes a discriminatory challenge, the prosecution or the defense, harm accrues both to the individual juror and to the community as a whole. *Id.*

In the present case, the state sought the death penalty for the murders of three women. Counsel selected the jury and exercised peremptory challenges on behalf of appellant in a manner that counsel believed would be

1. See generally Amy E. Haddad, Note, 60 TENN. L.REV. 229 (1992), for an excellent analysis of the issues raised in *McCollum.*

beneficial to their capital case. Since the jury did not award the death penalty for appellant, and assuming counsels' theory was correct, their strategy appeared to work. Now appellant, in his post-conviction petition, complains that counsel's strategy in the jury selection process amounted to ineffective assistance of counsel. The record certainly indicates that defense counsel considered race in the jury selection process. One of appellant's trial counsel, in fact, admitted as much during the post-conviction hearing. Nevertheless, we do not find that these actions resulted in ineffective assistance of counsel.

Without determining whether *McCollum* has retroactive application, or whether appellant has made out a prima facie case of racial discrimination, we suffice to say that under the standard announced in *Strickland*, appellant has failed to show that he was prejudiced as a result of the jury selection process. *McCollum* sought to remedy the denial of equal protection to prospective jurors who are excluded from service on the basis of race. Additionally, the Supreme Court recognized that such discriminatory challenges undermine public confidence in the criminal justice system. Even assuming, arguendo, that a *McCollum* case could be made, appellant was in no way deprived of a fair trial. His challenge on this matter is wholly inappropriate and without merit.

Appellant next alleges that his attorneys were ineffective because they failed to properly investigate and prepare his defense. Specifically, he says that his defense team's failure to: (1) interview Fannie Hall, (2) obtain a blood sample from Wilkerson, and (3) pursue the knife and gun issue resulted in ineffective assistance of counsel.

█ Fannie Hall died just weeks after she received the serious stabbing injuries. The record reflects that during the interim, she was unable to speak. Defense counsel cannot be faulted for failing to obtain a statement from her regardless of whether the statement would have been beneficial to the appellant.

█ As to the failure to obtain forensic evidence on Mr. Wilkerson as well as on the knife and gun found at Wilkerson's residence, we find the decision to have been a strategic one. Counsel explained at the post-conviction hearing that this information could very well harm appellant as much as it could help him. The trial court found no deficiency in the performance of counsel. We agree.

**CONCLUSION**

We commend appellate counsel for both sides on their performance during this appeal. They have represented their respective sides well. Also, in his usual thorough and deliberative manner, Judge Lafferty has filed excellent findings of fact and conclusions of law with which we agree. We also note that in the direct appeal of this case, a panel of this Court found that both the state and the defense team were well prepared for trial and the case was vigorously prosecuted and defended.

█ The trial judge's findings on questions of fact are conclusive unless this Court finds that the evidence preponderates against the lower court's judgment. *State v. Buford*, 666 S.W.2d 473, 475 (Tenn.Crim.App.1983); *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim.App.1978). Under the guidelines established by *Strickland v. Washington* and *Baxter v. Rose*, appellant has failed to show that he received the ineffective assistance of counsel.

Every post-conviction petitioner has the burden of proving the allegations in his petition by a preponderance of the evidence. *McBee v. State*, 655 S.W.2d 191, 195 (Tenn. Crim.App.1983). Appellant in this case has clearly not met his burden of proof. The trial judge was correct, and we agree with his findings of fact and conclusions of law. He rightfully denied the petition for post-conviction relief.

The judgment of the Shelby County Criminal Court is affirmed in all respects.

BIRCH and PEAY, JJ., concur.