## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
## NOVEMBER SESSION, 1997

FILED

January 15, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

PERVIS TYRONE PAYNE,          )
                              )       No. 02C01-9703-CR-00131
        Appellant             )
                              )       SHELBY COUNTY
vs.                           )
                              )       Hon. Bernie Weinman, Judge
STATE OF TENNESSEE,           )
                              )       (Post-Conviction  - Death Penalty)
        Appellee              )       (*Writ of Error Corum Nobis*)

For the Appellant:

**Burch, Porter & Johnson**
J. Brook Lathram
Les Jones
R. Porter Feild
130 N. Court Avenue
Memphis, TN  38103

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Amy L. Tarkington**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493


**William Gibbons**
District Attorney General

**Thomas D. Henderson and
Reginald Henderson**
Asst. District Attomeys General
Criminal Justice Complex, Suite 301
201 Poplar Street
Memphis, TN  38103

OPINION FILED: _____

AFFIRMED


**David G. Hayes**
Judge

**OPINION**

In this capital case, the appellant, Pervis Tyrone Payne, appeals as of right the judgment of the Criminal Court of Shelby County denying his consolidated petitions for post-conviction relief and *writ of error coram nobis*. In 1988, the appellant was convicted of two counts of first degree murder and one count of assault with intent to commit first degree murder, resulting in the imposition of two sentences of death and a sentence of thirty years imprisonment. The appellant's convictions and sentences were affirmed on direct appeal by both the Tennessee Supreme Court and the United States Supreme Court.[1] See State v. Payne, 791 S.W.2d 10 (Tenn. 1990), judgment affirmed by, 501 U.S. 808, 111 S.Ct. 2597 (1991).

In January, 1992, the appellant filed his original petition for post-conviction relief. As a result of an interlocutory appeal to our supreme court, the appellant's post-conviction hearing was conducted in August, 1996.[2] On October 10, 1996, the trial court denied post-conviction relief. The appellant's petition for *writ of error coram nobis* was denied on January 10, 1997.[3]

On appeal, the appellant raises the following issues:

I. Whether the State failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963);

II. Whether the appellant was denied the effective assistance of counsel at trial and on appeal;

---

[1] Certiorari was granted by the United States Supreme Court on the limited issue of the admissibility of victim impact evidence. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597 (1991), reh'g denied, 501 U.S. 1277, 112 S.Ct. 28 (1991).

[2] The appellant was granted an interlocutory appeal on the issue of whether the statute authorizing funds for investigative and expert services in capital cases applied to the post-conviction proceeding. Our supreme court found in the affirmative. See Owens v. State, 908 S.W.2d 923 (Tenn. 1995).

[3] Appellant's petition for *writ of error coram nobis* was filed on June 26, 1992, with argument being heard on January 9, 1997.

2

III.  Whether the appellant was denied his right to be free from cruel and unusual punishment in that the introduction of irrelevant testimony and a color videotape of the crime scene during the sentencing phase caused the jury to arbitrarily impose the death penalty;

IV.  Whether the appellant was denied his right to confront witnesses against him at the penalty phase of the trial;

V.  Whether the appellant was denied his right to due process when the prosecutors engaged in gross misconduct during the sentencing phase of the trial;

VI.  Whether the trial court erred in denying the appellant's Motion to Suppress or Exclude certain physical evidence and scientific test results after the State failed to provide timely notice thereof;

VII.  Whether the trial court properly instructed the jury; and

VIII.  Whether the trial court erred in denying the appellant an evidentiary hearing on his petition for *writ of error coram nobis.*

After reviewing the record, we affirm the judgments of the court below.

**Background**

The proof, as set forth in the supreme court's decision, Payne, 791 S.W.2d at 11-16, established that Charisse Christopher, age twenty-eight, lived with her two children, Nicholas, age three and one-half, and Lacie, age two and one half, in the Hiwassee Apartments in Millington.  The appellant's girlfriend, Bobbie Thomas, lived in the apartment across the hall from Ms. Christopher's apartment, and Nancy Wilson, the resident manager, lived in the downstairs unit directly below the Christophers.[4]  On June 27, 1987, the appellant visited Ms. Thomas' apartment several times in anticipation of their plans to spend the weekend together.  However, he found no one at home.  On one visit, he left his overnight bag and three cans of Colt 45 malt liquor near the entrance to Ms. Thomas' apartment.

---

[4]The building in which Ms. Christopher resided consisted of four units, two upstairs and two downstairs.  Each of the upstairs apartments had back doors in the kitchen that led to an open porch overlooking the back yard.  In the center of the porch was a metal stairway leading to the ground.  There was also an inside stairway leading to the ground floor hallway and front entrance to the four-unit building.

While waiting for Ms. Thomas to return, the appellant passed the morning and early afternoon injecting cocaine and drinking beer. Later, he and a friend cruised around the area looking at a magazine containing sexually explicit material. At approximately 3:00 p.m., the appellant returned to the Hiwassee Apartment complex and entered Ms. Christopher's apartment. At the same time, Nancy Wilson heard Ms. Christopher screaming, "get out, get out." The noise briefly subsided and then began, "horribly loud." Ms. Wilson called the police after she heard a "blood curdling scream" from the Christophers' apartment. A police unit was immediately dispatched to the Hiwassee Apartments. Meanwhile, although Ms. Wilson noted that the shouting, screaming, and running upstairs had stopped, she heard footsteps go into the bathroom, the faucet turned on, and the sound of someone washing up.

The first police officer arrived at the apartments within minutes of the radio dispatch. Upon arrival, he observed a black man on the second floor landing pick up an object and come down the stairs. The officer encountered the appellant as he was leaving the apartment building. He noted that the appellant had "blood all over him. It looked like he was sweating blood." The officer confronted the appellant, who responded, "I'm the complainant." When the officer asked "What's going on up there?" the appellant struck the officer with the overnight bag, dropped his tennis shoes and started running. The officer pursued him, but the appellant outdistanced him and disappeared into another apartment complex.

Inside the Christophers' apartment, the police encountered a horrifying scene. Blood covered the walls and floor throughout the unit. Ms. Christopher and her two children were discovered lying on the kitchen floor. Nicholas, despite abdominal stab wounds that completely penetrated his body, was still breathing. Ms. Christopher and Lacie were dead. Charisse Christopher had sustained forty-two direct knife wounds and forty-two defensive wounds on her arms and hands. The wounds were caused by forty-one separate thrusts of a butcher knife. None of

the eighty-four wounds inflicted were individually fatal; rather, the cause of death was most likely bleeding from all of the wounds. The body of Ms. Christopher was found lying on her back with her legs fully extended. Her shorts were pushed up on her legs and a used tampon was found beside the victim's lifeless body.

Lacie's body was on the kitchen floor near her mother. She had suffered nine stab wounds to the chest, abdomen, back, and head. One of the wounds cut the aorta and would have been rapidly fatal. The murder weapon, a butcher knife, was found at her feet. The appellant's baseball cap was recovered from Lacie's forearm - her hand and forearm sticking through the opening between the adjustment strap and the cap material. Three cans of Colt 45 malt liquor, bearing the appellant's fingerprints, were found on a small table in the living room. A fourth empty beer can was on the landing outside the apartment door. The appellant's fingerprints were also found on the telephone and counter in the Christophers' kitchen.

The appellant was apprehended later that day hiding in the attic of the home of a former girlfriend. As he descended the stairs of the attic, he stated, "Man, I ain't killed no woman." One of the arresting officers remarked that the appellant had a "wild look about him. His pupils were contracted. He was foaming at the mouth, saliva. He appeared to be very nervous. He was breathing real rapid." The appellant had blood on his body and clothes and several scratches across his chest. He also was wearing a gold Helbrose wristwatch that had bloodstains on it. It was later determined that the blood types found on the appellant's clothing matched the victims' blood types. A search of his pockets revealed a packet containing cocaine residue, a hypodermic syringe wrapper, and a cap from a hypodermic syringe. His overnight bag, which was found in a nearby dumpster, contained a bloody white shirt.

5

Laura Picard was visiting her sister in the same apartment complex that Saturday afternoon. She was sunbathing in the back yard and heard a noise like a person moaning coming from the Christophers' apartment followed by the back door slamming three or four times, "but it didn't want to shut. And this hand, a dark-colored hand with a gold watch, kept trying to shut that back door."

The medical examiner testified that Ms. Christopher was menstruating and a specimen from her vagina tested positive for acid phosphatase. He said that result was consistent with the presence of semen, but not conclusive, absent sperm, and no sperm was found.

At trial, the appellant took the stand on his own behalf. He testified that he did not harm any of the Christophers. Rather, he asserted that another man had raced by him as he was walking up the stairs. When he reached the landing, he heard a baby crying and a faint call for help and saw the door was ajar. He stated that, motivated by curiosity, he announced that he was coming in, and entered the apartment. He described what he saw as follows:

> I saw the worst thing I ever saw in my life and like my breath just had--had tooken--just took out of me. . . . she was looking at me. She had the knife in her throat with her hand on the knife like she had been trying to get it out and her mouth was just moving but words had faded away. And I didn't know what to do.

He explained that he got blood on his clothes and his person when he pulled the knife out of Ms. Christopher's neck and . . . "she reached up and grabbed me and hold me . . ." The appellant panicked and fled when he heard the police sirens. During the State's cross-examination, the appellant made the following admission:

Q.   Can you explain why there's bloodstains on your left leg?
A.   Left leg?
Q.   Yes, sir.
A.   Evidently it probably came--had to come from when she--when she hit the wall. When she reached up and grabbed me.
Q.   When she hit the wall?
A.   When she--when she hit--when she hit when I got ready to run up--when I got ready to vomit.
Q.   When she hit the wall she got blood on you?
A.   When she splashed. It was blood--a lot of blood on the floor.

Q.  She got blood on you when she hit the wall.  Is that what you said?
A.  She hit against the wall when she fell back.
Q.  Is that what you said, sir, that she got blood on you when she hit the wall?
A.  I didn't say she got blood on me when she hit the wall.
Q.  Isn't that what you said just a moment ago, sir?
A.  That ain't--that's not what I said.


The jury returned guilty verdicts against the appellant on all counts.


During the sentencing phase of the trial, the appellant presented the testimony of four witnesses.  Bobbie Thomas testified that she met the appellant at church.  She stated that he was a very caring person, and that he devoted much time and attention to her three children.  She said that her three children had come to love him very much.  She asserted that the appellant did not drink, nor did he use drugs, and that it was inconsistent with the appellant's character to have committed these crimes.  Dr. John Hutson, a clinical psychologist, testified that the appellant's scores were verbal IQ 78 and performance IQ 82.  Historically, the "mental retardation" score is considered 75.  Based upon these scores, Dr. Hutson found the appellant "mentally handicapped," but not "retarded."  He also stated that the appellant was the most polite prisoner he had ever met.  The appellant's parents testified that their son, who was twenty years old, had no prior criminal record and had never been arrested.  They also stated that the appellant had no history of alcohol or drug abuse, he worked with his father as a painter, he was good with children, and he was a good son.


The State presented the testimony of Charisse Christopher's mother, who related the emotional trauma that the double murders had on Nicholas and how he continues to cry for his mother and sister.


The jury found, as to both the murder of Charisse Christopher and Lacie Christopher, that the appellant knowingly created a great risk of death to two or

more persons other than the victim murdered during his act of murder and that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. As to the murder of Lacie Christopher, the jury found that the murder was committed against a person less than twelve years of age and the appellant was eighteen years of age or older. Finding no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstances, the jury sentenced the appellant to death on each of the murder counts.

**Post-Conviction Hearing**

In post-conviction proceedings, the appellant must prove the allegations contained in his petition by a preponderance of the evidence. State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1991); Oliphant v. State, 806 S.W.2d 215, 218 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1991). Findings of fact and conclusions of law made by the trial court are given the weight of a jury verdict, and, this court is bound by those findings unless the evidence contained in the record preponderates otherwise. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990); Teague v. State, 772 S.W.2d 932, 934 (Tenn. Crim. App. 1988), cert. denied, 493 U.S. 874, 110 S.Ct. 210 (1989). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. Questions concerning the credibility of witnesses and the weight and value to be given their testimony are for resolution by the trial court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

## I. Alleged Brady Violations

Approximately four years after the appellant's conviction, members of the appellant's defense team inspected and reviewed the investigative files of the Millington Police Department relating to the prosecution of Pervis Tyrone Payne. The appellant contends that the failure of the State to disclose the following evidence revealed in the investigative reports was violative of his right to due process of law. Brady v. Maryland, 373 U.S. at 83, 83 S.Ct. at 1194: (1) that Charisse Christopher had a boyfriend who spent the night with her the night before her murder and (2) that Charisse Christopher had told her children's babysitter the night before the murders that she "was having a problem with someone."

### A. Brady v. Maryland

In Brady v. Maryland, 373 U.S. at 83, 83 S.Ct. at 1194, the United States Supreme Court held that, in a criminal case, the prosecution has a compelling duty to furnish the accused with exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. See Bell v. State, No. 03C01-9210-CR-00364 (Tenn. Crim. App. at Knoxville, Mar. 15, 1995), perm. to appeal denied, (Tenn. Aug. 28, 1995). Exculpatory evidence under Brady includes information or statements of witnesses which are favorable to the accused. See, e.g., McDowell v. Dixon, 858 F.2d 945 (4th Cir. 1988), cert. denied, 489 U.S. 1033, 109 S.Ct. 1172 (1989); State v. Goodman, 643 S.W.2d 375, 379-80 (Tenn. Crim. App. 1982). Moreover, exculpatory evidence under Brady includes information which can be used only for impeachment purposes. See Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 766 (1972); Workman v. State, 868 S.W.2d 705, 509 (Tenn. Crim. App. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207 (1994); State v. Davis, 823 S.W.2d 217, 218 (Tenn. Crim. App. 1991). Failure to reveal exculpatory evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution. Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97. In order to determine the materiality of undisclosed information, the reviewing court must ascertain whether "in [the] absence [of the information] [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, ---, 115 S.Ct. 1555, 1566 (1995). See also State v. Edgin, 902 S.W.2d 387, 390 (Tenn.), *as amended on reh'g*, (1995). Thus, in order to prove a Brady violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id.

Before a reviewing court may find a due process violation under Brady, four prerequisites must be satisfied:

> (1) The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> (2) The State must have suppressed the information;
>
> (3) The information must have been favorable to the accused; and
>
> (4) The information must have been material.

Edgin, 902 S.W.2d at 390. The appellant bears the burden of demonstrating the elements of this claim by a preponderance of the evidence. See Smith v. State, 757 S.W.2d 14, 19 (Tenn. Crim. App. 1988).

### 1. Information Regarding Darryl Shanks

At the post-conviction hearing, various witnesses were called to testify as to their participation in the investigation and trial. Former Millington Police Detective Sammy B. Wilson, the lead investigator in the Christopher murders, testified that during his investigation of this case he had occasion to communicate and work with the district attorney's office. Detective Wilson kept all notes and reports concerning this case in a notebook and explained that the district attorney general's office had access to this notebook. Included in this notebook were Wilson's notes from a July

10

1, 1987 telephone conversation with Darryl Shanks, Charisse Christopher's boyfriend. The notes revealed that Shanks saw Charisse on the Thursday evening preceding the murder. Detective Wilson could not recall whether Shanks had said he had spent the night at Christopher's apartment.

On November 11, 1992, after the post-conviction hearing had been initiated, Darryl Shanks signed an affidavit, submitted by the appellant's post-conviction investigator, which stated, in part:

> The last time I saw Charisse was during the early morning hours of June 27, 1987. I stopped at her apartment and spent the night with her, and we had sex. I left the apartment approximately eight hours before she was killed. I did inform the prosecuting attorney, Henderson, of this fact.

At the hearing, Shanks testified that when he signed the affidavit he had misconstrued the inquiry into the nature of his relationship with Charisse. He stated that he understood his answer to mean that he previously had sexual relations with Charisse during the course of their relationship, but not on the night preceding her murder. He revealed that he had been involved in an "on and off" intimate relationship with Charisse Christopher for the past fourteen years. He stated that he last saw Charisse alive the night before her murder. He added that he spent the night at her apartment, however, he averred that they did not have sexual relations because Charisse was menstruating and because Lacie had a nightmare that evening and had slept with them in their bed. He maintained that the last time he and Charisse had intimate relations was approximately two weeks prior to that night.

Jim Garts, the appellant's trial counsel, testified that this was his first death penalty case as a defense attorney, however, he stated that he had been practicing law for over nineteen years, three of which were spent as an assistant district attorney general. Garts maintained that he made every effort to protect his client's constitutional rights. He testified that, because of the odd nature of this case, motive was an important issue. He conceded that, although the State could not

11

show that a particular person had sexual relations with Ms. Christopher on the day of the murders, the testimony from two expert witnesses concerning acid phosphatase found in a sample taken from Ms. Christopher's vagina was both significant and lengthy. Garts' strategy on cross-examination was to show that this testimony did not prove anything with respect to the appellant. The testimony revealed that, although acid phosphatase is a good indicator of sexual contact, it can be found in a person who has not had sex. Garts further testified that, if he had been provided the information that Darryl Shanks had spent the previous night with Charisse Christopher, his strategy would have changed. Specifically, he stated that he would have put Shanks on the stand to show that this expert testimony was "a smoke screen created by the district attorney's office." In other words, if Shanks had testified that he had sexual intercourse with Charisse the previous night, then it would have eliminated the State's expert testimony on phosphatase acid. Even if Shanks had not testified that he had sex the previous night, Garts would still have put him on the stand to create a doubt in the jury's minds as to who was the source of the acid phosphatase. Garts testified that he filed a Brady request and that the information regarding Darryl Shanks should have been provided to him.

The State presented the testimony of Tom Henderson, the lead prosecutor in this case. Henderson did not recall meeting or talking with Darryl Shanks, however, his case notes reflect the name of "Daryl Starks." The notes indicate that "Starks" was Charisse Christopher's boyfriend and that an investigator was looking for him. Henderson testified that, because of Garts' former affiliation with the district attorney's office, he had turned over more information to Garts than what was required. He believed that, if Garts had been given the information that Shanks had intercourse with Charisse Christopher the night before the murders, Garts would have used it to explain the acid phosphatase present in Ms. Christopher's body. Henderson also stated that, if Shanks had told him that he had sex with Ms. Christopher the night before the murder, he would have turned the information over

to Garts. However, Henderson would not have considered it Brady material if Shanks had merely told him he had spent the night. Henderson admitted that the prosecution attempted to show the appellant had attempted to rape Ms. Christopher. Notwithstanding the State's effort, however, he felt that the jury rejected this theory because it did not find the felony murder aggravating circumstance. Moreover, he felt the strongest evidence indicating rape was the removed tampon and the position of the victim's shorts.

Obviously, the State was in possession of information that Darryl Shanks was the boyfriend of Ms. Christopher. However, as the trial court found, there is not "any indication that the prosecutors had any information in their possession that would indicate that Mr. Shanks and Ms. Christopher had sex[ual] relations the night prior to the murders." The affidavit signed in 1992 and Shanks testimony at the post-conviction hearing are irrelevant to our determination of a Brady violation. Our perspective of the undisclosed information is to be evaluated based upon that information which would have been available at the time of the non-disclosure. Thus, our contemporaneous assessment focuses solely on the police investigative report which reveals that Darryl Shanks, Charisse Christopher's boyfriend, "saw [the] victim [the] Thursday nite [sic] [preceding the murders]," and not, as the appellant argues on appeal, "the night before the murder." Next, defense counsel filed a motion requesting exculpatory evidence. However, the motion did not specifically request the name of the boyfriend of the victim. Thus, the only questions remaining are whether the evidence is exculpatory, and, if the evidence is exculpatory, whether the information is material.

The trial court concluded that information revealing Mr. Shanks as the boyfriend of Ms. Christopher is "not . . . the type of information that the prosecutor would have a constitutional obligation to disclose. . . ." We agree with the trial court that the undisclosed material was not exculpatory. We are unpersuaded that,

13

because Shanks spent Thursday night with the victim, Charisse Christopher, prior to her murder on Saturday afternoon, this fact would have served to weaken the State's theory of a sexual motive. Our review focuses, not on speculation or conjecture, but rather upon those undisputed facts and circumstances surrounding the murders. The proof does show that, after a period of injecting cocaine, drinking beer, and looking at sexually stimulating pictures, the appellant entered Ms. Christopher's apartment. Upon his leaving her apartment, she was found lying on her back, a used tampon at her side, her shorts pushed up, and the presence of acid phosphatase in her vagina. We find from these facts that a rational jury could have clearly inferred that the attack upon Charisse Christopher was sexually motivated. Moreover, we conclude that the fact that Shanks spent the night with Ms. Christopher two days prior to her murder would not have diminished the State's theory that the crimes were sexually motivated. Accordingly, we conclude that the information regarding Darryl Shanks is not favorable, or even relevant, to the guilt or innocence of the appellant. The appellant has not satisfied his burden of showing that the undisclosed information is exculpatory. This claim is without merit.

## 2. Information about Kay Mason

The case notebook of Detective Wilson also contained a note referencing a conversation, on July 1, 1987, with Kay Mason, Charisse Christopher's babysitter. During this conversation, Mason had informed Wilson that Charisse had told her that she was having a problem with someone. Ms. Christopher related that she thought she might call the police, but later recanted and said that she would take care of it herself. A criminal complaint filed by Kay Mason on July 1, 1987, was also in the notebook. According to the corresponding police report, Mason had received a telephone call at approximately 9:25 p.m. She did not recognize the caller's voice and could not discern the caller's race. However, she could tell that the caller was attempting to disguise his voice. The caller said "Do you know what happened to those children?" He then instructed her to keep her mouth shut and hung up the

14

telephone. Mason told the police officers that relatively few people knew her home telephone number.

At the hearing, Mason confirmed that, the day prior to the murders, Charisse Christopher stated that she was having a problem with "someone" or "something." She added that "[Charisse] wasn't upset" about the matter. Additionally, she stated that, although she had told the police that few people knew her phone number, at the time she received the telephone call, she was raising money for Nicholas' medical bills and her phone number was flashed on the television. She added that the caller threatened her that "if she did not stop raising money, the same thing would happen to her and her children." The telephone call was made after the appellant had been arrested.

Garts testified that, while he also did not receive the information regarding Kay Mason's complaint to the police, he was not certain that this information was of any value. Regardless of its potential worth, Garts maintained that had he been provided with the information he would have interviewed Kay Mason.

Henderson testified that he could not recall nor did his notes reflect Mason's complaint to the police department. However, he stated that, had he known about Mason's interview with Detective Wilson and her subsequent complaint, he would not have disclosed them under Brady. However, he conceded that he would have wanted to talk with Mason to inquire as to whether the appellant could have been "the problem" mentioned by Ms. Christopher.

Our examination of the record leads us to the conclusion that (1) the information was requested and (2) that the information was in the possession of the State. Again, we are left to ascertain whether the information was indeed exculpatory, and, if it is exculpatory, whether the information is material.

15

Regarding these inquiries, the trial court made the following findings:

The Court is of the opinion that the information concerning threats made to Ms. Mason subsequent to the murders would not serve to exculpate Mr. Payne. There is no information as to who made these threats. It would be reasonable to assume that these threats were made on behalf of Mr. Payne as it would be that they were being made to protect someone else. As previously stated, Mr. Henderson indicated that he would have tried to connect them to the petitioner and Mr. Garts testified to the effect that he did not believe knowledge of these threats would have been beneficial to his client, though he would have further investigated them.[5]

Again, the questioned undisclosed information consists of (1) the conversation between Charisse Christopher and Kay Mason and (2) the telephone threats made to Kay Mason after the appellant's arrest. We fail to find the challenged information exculpatory. To conclude that the telephone threats were made by the "real killer" is merely speculative. It is just as possible that the threats were made on behalf of the appellant. Additionally, regarding the conversation between Mason and Christopher, defense counsel admitted that not much could be done with this information. The appellant has failed to carry his burden of showing that this information was exculpatory. This issue is, likewise, without merit.

## B. Conclusion of Brady Challenges

The Tennessee Supreme Court made it clear in Edgin that a criminal defendant has the burden of proving a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 389. The trial court found that the appellant had failed to carry this burden. We agree. Again, we reiterate that "the Brady rule does not require a prosecutor to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive him of a fair trial. . . ." State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995), cert. denied, -- U.S. --, 117 S.Ct. 88 (1996). As we conclude that the challenged information is not exculpatory, we need not reach the issue of the information's materiality. This

[5]We acknowledge the fact that the trial court did not make specific findings as to Mason's conversation with Charisse Christopher the day preceding the murders.

16

challenge is without merit.

## II. Ineffective Assistance of Counsel

Next, the appellant contends that he was denied effective representation of counsel due to his counsel's: (1) failure to appeal the denial of the appellant's right to an impartial jury when jurors were asked whether they could execute him; (2) failure to present a consistent trial theory throughout the guilt and sentencing phase of the trial; (3) failure to investigate and present adequate mitigation evidence at the sentencing phase; (4) failure to object to highly emotional testimony at sentencing phase; and (5) failure to object to prosecution's closing argument during sentencing phase. We note that issues four and five have been previously determined on direct appeal. The fact that these issues are now couched in terms of ineffective assistance of counsel is of no consequence. See Overton v. State, 874 S.W.2d 6, 12 (Tenn. 1994) ("to allow every error committed by the trial court to be recast in a post-conviction petition as an ineffective assistance of counsel allegation would be to subvert the limited purposes of the post-conviction procedure").

Additionally, without citation to the record, explanation, or citation to any legal authority, the appellant lists eight additional allegations of ineffective assistance of counsel.[6] The State submits that these eight additional allegations have been waived. We agree. None of these claims were argued at the post-conviction hearing nor was any proof presented. When an appellant fails to articulate reasons to support a conclusory statement, the issue may be deemed waived. Tenn. R. App. P. 27(a)(7); State v. McKay, 680 S.W.2d 447, 454 (Tenn. 1984), cert. denied,

---

[6]Specifically, these eight grounds are: (1) failure to adequately investigate the case; (2) failure to interview certain witnesses and request and examine certain hospital records; (3) failure to object to certain irrelevant and inflammatory evidence; (4) failure to object to gross prosecutorial misconduct during sentencing phase; (5) failure to object to State's argument that death penalty serves as a general deterrent; (6) failure to request a continuance for scientific and physical evidence; (7) failure to provide effective assistance on direct appeal; and (8) failure to object to unconstitutional jury instructions.

470 U.S. 1034, 105 S.Ct. 1412 (1985). See also Tenn. Ct. Crim. App. R. 10(b); State v. Campbell, 904 S.W.2d 608, 614 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1995).

Regarding the appellant's contention that he was denied effective assistance of counsel based upon trial counsel's failure to present a consistent theory throughout the guilt phase and the sentencing phase of the trial, we note that the appellant fails to explain how trial counsel's theory was inconsistent and fails to make appropriate references to the record. Again, an issue may be waived when a defendant fails to articulate reasons to support a conclusory statement. Tenn. R. App. P. 27(a)(7); McKay, 680 S.W.2d at 454; Adkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1994). Notwithstanding waiver of this issue, the record simply does not support the appellant's contention. The defense's theory at the guilt phase was that these murders were committed by someone other than the appellant. The appellant testified that he did not commit these crimes and five witnesses testified as to the appellant's reputation for truth and veracity. At the sentencing hearing, defense counsel presented the testimony of the appellant's parents and of his girlfriend, all of whom testified that these murders were completely inconsistent with the appellant's character.

Accordingly, our review of the appellant's Sixth Amendment claim is limited to two issues:

(1) Whether counsel failed to raise Witherspoon violations on direct appeal; and

(2) Whether counsel failed to adequately investigate and present mitigating evidence during the sentencing phase of the trial.

### A. Standard for Determining Ineffective Assistance of Counsel

In determining whether the appellant received effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution and Art. I, Sec. IX of the Tennessee Constitution, this court must look to whether the

18

performance of trial counsel was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To reverse a conviction on these grounds, the appellant must show, by a preponderance of the evidence, Taylor v. State, 875 S.W.2d 684, 686 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994), that counsel's representation was deficient and that there was prejudice resulting from that deficiency.[7] Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052. 2064 (1984). Unless the appellate court finds that the evidence preponderates against the factual findings of the trial court, the findings of the trial court are conclusive on appeal. Butler v. State, 789 S.W.2d at 899.

Counsel's representation is deficient if the errors were so serious as to deprive the appellant of representation guaranteed by the Sixth Amendment. Cox v. State, 880 S.W.2d 713, 717 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994). The deficient representation becomes prejudicial when the appellant is deprived of a fair trial with a reliable result. Id. However, this court's review may first look at the prejudice prong of Strickland. If the court finds that the defendant suffered no prejudice, a deficiency, if any, is considered harmless. Strickland, 466 U.S. at 693, 104 S.Ct. at 2067. Therefore, even if there are attorney errors, in order to succeed on an ineffectiveness claim, the appellant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 693, 104 S.Ct. at 2068.

While the post-conviction court did not address every claim of ineffective assistance of counsel individually, it made the following findings of facts and conclusions of law:

_____

[7]The Strickland standard has been applied to the right of counsel under Article I, Section IX of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn.), cert. denied, 493 U.S. 874, 110 S.Ct. 211 (1989).

19

The next issue to be determined is the petitioner['] s claim of ineffective assistance of counsel.  There is an accusation concerning insufficient psychological evidence presented by the defense at the sentencing stage of the trial.  As heretofore stated, Dr. Baroff testified at the hearing on this petition that Mr. Payne's IQ is 78 and he functioned within the range of a ten or eleven year old.  The trial transcript reflects that Dr. John Hutson testified at the sentencing hearing that he had evaluated Mr. Payne and determined his IQ was 78. . . . The record further reveals that Dr. Hutson was examined on his findings on both direct and cross-examination.  <u>This Court does not find a deficiency in the expert testimony presented by the defense at the sentencing stage of the trial.</u>

The Court will next consider the character proof put on by the defense at the sentencing hearing.  Other than Dr. Hutson the defense had three witnesses at the sentencing stage, Bobbie Thomas . . .Bernice Payne . . .and Carl Payne. . . .

At this hearing the petitioner presented seven character witnesses that would have been available at trial.  The record seems to reveal that there may have been some concern about the cross-examination of character witnesses involving allegations of other criminal activity by the defendant.  This Court would note that at this hearing Mr. Garts was not asked why he limited the number of character witnesses at the sentencing stage.

"Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief.  Counsel has some discretion in conducting the defense and is entitled to use his best judgment in matters of trial strategy or tactics.  See <u>McBee v. State</u>, 655 S.W.2d 191.",[sic] (Tenn. Crim. App. 1984) [sic] <u>Taylor v. State</u>, 814 S.W.2d 374.[sic]

<u>This Court does not find ineffective assistance of counsel because the trial attorney could have presented more character proof during the course of the trial.  If counsel had presented seven character witnesses it could have been argued that ten would have been a better number.</u>

_____. . .

<u>The Court finds that the advice given and services rendered by the defendant's counsel was within the range of competency demanded by an attorney in a criminal case and that Mr. Garts' representation of the defendant at his trial complied with the requirements set out by the Supreme Court of Tennessee in _Baxter v. Rose_ . . . .</u>

There were numerous other issues enumerated in the Petition for Post-Conviction Relief that counsel for the petitioner agrees have either been ruled upon by the appellate courts or have been waived.

(emphasis added).

### 1. Failure to Raise <u>Witherspoon</u> Violation on Direct Appeal

The appellant argues that appellate counsel was ineffective for failing to raise on direct appeal the issue of whether potential jurors were excluded in violation of the Sixth and Fourteenth Amendment of the United States Constitution and in violation of Article I, § 6 of the Tennessee Constitution.[8]  Specifically, the appellant contends that the State violated the dictates of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770 (1968) and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844 (1985) by improperly questioning prospective jurors, specifically, prospective jurors Evon Bentley, Jessie Brown, and Tommie Johnson, during the voir dire stage of the trial, as to whether they could sentence this specific defendant to death by electrocution. Thus, the appellant insists that, because the prosecution's questioning of these particular jurors violated Witherspoon - Wainwright, resulting in challenges for cause and dismissal of these jurors, appellate counsel was ineffective for failing to raise this issue on direct appeal.

A prospective juror may be excluded for cause because of his or her views on capital punishment when those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Wainwright, 469 U.S. at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526 (1980)).  The Witherspoon standard was clarified in Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. at 852:

> That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  We note that, in addition to dispensing with Witherspoon's reference to "automatic" decision making, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity."

The specific question challenged by the appellant was the prosecutor's inquiry:

---

[8]We note that the appellant failed to present any proof as to this issue at the post-conviction hearing.  The trial court, likewise, did not specifically address this issue in its findings of facts.

21

> Does everybody here believe that if they find <u>this defendant</u> guilty beyond a reasonable doubt and to a moral certainty of murder in the first degree, and if you also find that there are aggravating circumstances and that there are aggravating circumstances not outweighed by mitigating circumstances, <u>can you and will you sentence him to death by electrocution?  Can you do that?</u>  I'm going to point to you.  I'm going to point to you and ask you to answer for me, please.  Will you be able to do that?

(emphasis added).  The record reflects that, before asking this question, the prosecutor prefaced the inquiry with a detailed explanation (five pages of the transcript) of the trial procedure, jury's role, and applicable law in the present case.  At trial, this line of inquiry drew an immediate objection by trial counsel which was followed by the trial court's extensive voir dire of the potential jurors concerning the performance of their duties as jurors.

The appellant contends that the emphasized portion of the prosecutor's inquiry violated <u>Witherspoon</u> because "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him."  <u>Witherspoon</u>, 391 U.S. at 522, 88 S.Ct. at 1777 footnote 21.  Footnote 21 continues, however, to provide:

> We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear . . . (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.

<u>Id</u>. (emphasis in original).  Within this context, we find that, although the question was improperly couched, the responses of the respective veniremen made it unmistakably clear that their views on the death penalty would substantially impair the performance of their duties as jurors.  Accordingly, no prejudice is shown.

"[E]xperienced advocates have long 'emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.'"  <u>Cooper v. State</u>, 849 S.W.2d 744. 747

22

(Tenn. 1993) (citing <u>Jones v. Barnes</u>, 463 U.S. 745, 751, 103 S.Ct. 3308, 3313 (1983)).  As we have determined the substance of the appellant's claim to be without merit, we cannot conclude that the failure of appellate counsel to raise this issue on direct appeal amounted to deficient performance or that counsel's failure to raise this issue prejudiced the appellant.  <u>See</u> <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375, 106 S.Ct. 2574, 2583 (1986) (to prevail on ineffectiveness claim involving counsel's failure to raise legal issue on appeal, defendant must show that issue has merit).  This claim is without merit.

## 2. Failure to Investigate and Present Mitigating Proof at Sentencing

The appellant asserts that counsel was ineffective at the sentencing phase for (1) failing to illicit mitigating evidence from witnesses; (2) failing to properly interview witnesses prior to testifying; (3) failing to adequately investigate existence of additional mitigators; (4) failing to present existing psychological evidence of

reasoning skills; and (5) failing to develop and present a comprehensive mitigating plan.

In response, the State submits that (1) there was a valid strategic reason for limiting the testimony of the five character witnesses called at the guilt phase because information concerning the appellant's bad character and habits would have detracted from the mitigation character witnesses; (2) the proof and closing argument presented by trial counsel was exactly the type of character and background evidence which the appellant now argues should have been presented through the testimony of more witnesses; and (3) the post-conviction court properly held that, on a comparison of the expert testimony at the sentencing hearing and at the post-conviction hearing, there was no deficiency in the expert testimony

presented at the penalty phase. Moreover, the State emphasizes, as did the trial court, that trial counsel was not given the opportunity to explain the choices he made in the presentation of the appellant's defense.

A brief summary of mitigation evidence presented during the appellant's trial follows: During the guilt phase of the appellant's trial, trial counsel called William Brooks, Willie Wright, Vera Wherry, Sidney Thomas, and John Scott to testify that the appellant had a good reputation for truth and veracity. The record indicates that the prosecutor attempted to question these witnesses about prior bad acts of the appellant including his drug use and reputation as a peeping Tom. Then, at the sentencing phase, the appellant's girlfriend and his parents testified regarding the appellant's general good character, that he was not known to use drugs or alcohol, his church attendance, and that he was a good worker. The appellant's father also testified that the appellant had dropped out of high school in the twelfth grade. Trial counsel called Dr. Hutson, a clinical psychologist. Dr. Hutson revealed that the appellant had "a full scale IQ of 78 with a variance of plus or minus three, with a verbal IQ of 78, plus or minus 3, and a performance IQ of 82, plus or minus 4," thus, placing the appellant "approximately one standard deviation below the norm of average intelligence." He described the appellant as "somewhat naive" and one of the most polite individuals he had ever interviewed in jail. During his closing argument during the sentencing phase, counsel referred to the five character witnesses who testified at the guilt phase. He also told the jury that "[w]e could call every person seated back there and they would say essentially the same things about Pervis and their experiences with Pervis over the years. And you can consider the support that he has as a mitigating circumstance."

### a. Duties of Counsel In Capital Cases

Our supreme court has observed that there is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a

capital trial. Melson, 772 S.W.2d at 421. However, mitigating evidence, *i.e.*, any aspect of the defendant's character or record that justifies a sentence less than death, is relevant to sentencing hearing and should be heard. See Zagorski v. State, No. 01C01-9609-CC-00397 (Tenn. Crim. App. at Nashville, June 6, 1997), perm. to appeal granted, (Tenn. Nov. 3, 1997) (citing Lockett v. Ohio, 438 U.S. 586, 604-605, 98 S.Ct. 2954, 2964-65 (1978) (*plurality opinion*); Johnson v. Texas, 509 U.S. 350, 361, 113 S.Ct. 2658, 2666, reh'g denied, 509 U.S. 941, 114 S.Ct. 15 (1993); California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 839 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S.Ct. 869, 876-77 (1982)). "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. at 544, 107 S.Ct. at 841. Thus, although there is no requirement that defense counsel present mitigating evidence in the sentencing phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and sentencing phases. Goad v. State, 938 S.W.2d 363, 369-70 (Tenn. 1996) (citations omitted). The extent of the investigation required by counsel regarding such mitigating evidence depends critically upon information supplied by the defendant. Zagorski, No. 01C01-9609-CC-00397 (citing Burger v. Kemp, 483 U.S. 776, 795, 107 S.Ct. 3114, 4126 (1987); see also Whitmore v. Lockhart, 8 F.3d 614, 621 (8th Cir. 1993)).

In determining whether or not trial counsel was ineffective for failing to present mitigating evidence, our supreme court has outlined several factors to consider in making such an evaluation. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. Goad, 938 S.W.2d at 371 (citing Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); Cooper, 847 S.W.2d at 532; Adkins, 911 S.W.2d at 334). Second, the court must determine whether

25

substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Id. (citing Atkins v. Singeltary, 965 F.2d 952 (11th Cir. 1992); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 990); Melson, 772 S.W.2d at 421)). Third, the court must consider whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Id. (citing Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1990); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987)).

### 1. Evidence Available but not Presented

At the post-conviction hearing, four of the five character witnesses who testified at the guilt phase of the appellant's trial again testified as to the appellant's good reputation and character. Specifically, Sydney Thomas reiterated the appellant's attendance at church, the appellant's musical talents and how the appellant taught younger children to play the drums. William Brooks, the appellant's assistant high school principal, testified regarding the appellant's leadership role in high school, including his participation in the band and the glee club. Willie Wright, the owner of a store in Drummonds, stated that he had extended the appellant credit on a store account and that the appellant drove Wright's son to band practice. John Scott, the principal of Munford High School, explained that the appellant got along well with all students and was never a disciplinary problem.

Additionally, four other witness who did not testify at the appellant's trial testified that they were not interviewed by Garts and would have offered mitigating testimony on the appellant's behalf. The appellant's two sisters described their relationship with their brother. They testified that he was always involved in their lives and was very protective. They also mentioned that the appellant was a very popular young man. Stephanie Robinson testified that the appellant transported herself and her family to church services. Martha Fain, a guidance counselor at Munford High School, stated that, although the appellant was not a discipline

26

problem, he sometimes needed extra help in science class.

Additionally, the appellant presented testimony of two expert witnesses. Gloria Shettles, a mitigation specialist with Inquisitor Incorporated, testified that she spent approximately sixty hours on this case investigating potential mitigating proof that was not presented at the appellant's sentencing hearing. She testified that "[t]his is probably the easiest investigation I've ever done," because potential witnesses were easily located. In her opinion, Garts' investigation was minimal and very poor. Dr. George Baroff, a clinical psychologist, examined the appellant and confirmed Dr. Hutson's evaluation of the appellant, *i.e.*, an IQ of 78, which placed the appellant in a category of borderline intelligence. However, Dr. Baroff added that the appellant had the reasoning ability of a ten year old child.

### 2. Comparison with Evidence Presented

The appellant contends that presentation of this evidence would have shown that, up until the present offenses, he had been a good person. Initially, we note that, regarding counsel's failure to interview all potential mitigation witnesses, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." Stickland v. Washington, 466 U.S. at 691, 104 S.Ct. at 2066. Clearly, the testimony of the non-testifying mitigating witnesses was merely cumulative of that offered by those character witnesses called at both the guilt and penalty phase. See Tenn. R. Evid. 403. Additionally, the testimony of Dr. Baroff merely confirmed that of Dr. Hutson. Id. Finally, Garts' closing argument detailed the appellant's life noting that the appellant had lived an exemplary life until these crimes had been committed. In almost an effort to explain his limited presentation of mitigation witnesses, Garts stated in closing argument:

> . . .You have heard from character witnesses from every walk of life. I just chose five people that have known Pervis all his life. People from

27

every walk of life, in education, his high school principal. Farthest thing from anybody's mind that Pervis could ever do or be accused of anything like this. . . .

. . . We could call every person seated back there and they would say essentially the same things about Pervis and their experiences with Pervis over the year. And you can consider the support that he has as a mitigating circumstance.

Again, we cannot minimize trial counsel's obvious concerns that testimony about the appellant's character would have opened the door to questions about the appellant's alleged bad acts. Absent a showing that counsel's tactical decision was uninformed due to inadequate preparation, this court will not second guess the strategic choices made by trial counsel. See Hellard, 629 S.W.2d at 9.

### 3. Evidence of Aggravating Factors

The proof of the aggravating circumstances was extremely strong in this case. As to both murders, the jury found that the appellant knowingly created a great risk of death to two or more persons other than the victim murdered during his act of murder and that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Additionally, regarding the killing of Lacie Christopher, the jury found that the murder was committed against a person less than twelve years of age and the defendant was eighteen years of age or older. The appellant cannot show that a reasonable probability of a different result had the additional mitigation evidence been introduced. Considering the cumulative nature of the mitigating evidence in comparison with the strength of the existing aggravating factors, we conclude that the appellant cannot show that he was prejudiced by the absence of the additional proof. Stickland, 466 U.S. at 697, 104 S.Ct. at 2069.

After consideration of the appellant's claims of ineffective assistance of counsel, we find that (1) trial counsel's performance was not deficient and (2) no prejudice enured to the disadvantage of the appellant. This issue is without merit.

### Post-Conviction Issues Previously Determined

The appellant concedes that several of his post-conviction claims have been previously determined on direct appeal by the Tennessee Supreme Court. Specifically, the following issues have been previously determined by the supreme court:

> (1) that the appellant was denied his right to be free from cruel and unusual punishment in that the introduction of irrelevant testimony and
>
> a color videotape of the crime scene during the sentencing phase caused the jury to arbitrarily impose the death penalty, see Payne, 791

29

S.W.2d at 19-20;

(2) that the State's argument concerning Nicholas Christopher's future desire that the appellant be executed violated his right to confront witnesses[9], see Payne, 791 S.W.2d at 18;

(3) that the appellant was denied his right to due process when the prosecutors engaged in gross misconduct during the sentencing phase of the trial, see Payne, 791 S.W.2d at 20;

(4) that the appellant was denied a fair trial because the trial court denied the appellant's motion to suppress certain scientific and physical evidence based upon the State's failure to provide timely notice thereof, see Payne, 791 S.W.2d at 16; and

(5) that the trial court failed to properly instruct the jury at the sentencing hearing, see Payne, 791 S.W.2d at 20-21.

Issues that have been previously determined on direct appeal cannot support a petition for post-conviction relief and are, therefore, excluded. See Tenn. Code Ann. § 40-30-111, -112 (a)(1990)(repealed 1995); State v. Denton, 938 S.W.2d 373, 377 (Tenn. 1996); House v. State, 911 S.W.2d 705, 710 (Tenn. 1995), cert. denied, -- U.S.--, 116 S.Ct. 1685 (1996).

## III. Petition for *Writ of Error Coram Nobis*

The appellant timely filed a petition for *writ of error coram nobis* based upon newly discovered evidence, *i.e.*, the testimony of Kay Mason developed at the post-conviction hearing and the affidavits of John Edward Williams. The appellant contends that both Mason's testimony and Williams' statements identify another person as the perpetrator . The appellant claims that this newly discovered information corroborates his testimony that another person was present at the crime

---

[9]On direct appeal, the appellant attacked the very same portion of the prosecutor's argument. The Tennessee Supreme Court concluded that even if the argument was error, it was harmless beyond a reasonable doubt. See Payne, 791 S.W.2d at 19. The United States Supreme Court later determined that the argument was not a violation of the Eighth Amendment. See Payne, 501 U.S. at 827, 112 S.Ct. at 2609. To the extent that the appellant did not present this argument in the context of being a denial of a right to confrontation, he has waived his right to raise the claim. See Tenn. Code Ann. § 40-35-111, 112(b)(1) ("[a] ground for relief is 'waived' if the petitioner knowingly and understandingly failed to present it for determination in any proceedings before a court of competent jurisdiction in which the ground could have been previously presented").

scene.  Essentially, for purposes of the *writ of error coram nobis* proceedings, the appellant alleges that Ms. Mason's testimony was relevant because Charisse Christopher had told her, shortly before her murder, that she was having a problem with someone or something, and, because subsequent to Ms. Christopher's murder, Ms. Mason received threatening phone calls, which the appellant contends could be attributable to the actual murderer.  The appellant also presented two affidavits of John Edward Williams.  In the first affidavit, Williams stated that he had been present on several occasions when Charisse Christopher sold cocaine in her apartment and when she used it in her apartment.  He also stated that he had bought cocaine from her and used it with her.  In his second affidavit, Williams related that, on the afternoon of June 27, 1987, he saw the appellant in front of the apartment building and then saw the appellant enter the building.  He next saw a black man, who was not the appellant, leave the building, get in a car, and drive away.  Soon after that, he saw the appellant running from the building.  Williams averred that he had seen the unidentified black man with Charisse Christopher on several occasions, and that sometimes this black man and Charisse were arguing.

In denying the appellant's request for an evidentiary hearing on the petition for *writ of error coram nobis*, the trial court made the following finding:

> The Court finds that the information contained in the affidavits of John Edward Williams coupled with the testimony of Kay Mason, taken as true, would not have resulted in a different judgment if this evidence had been presented at trial.

A *writ of error coram nobis* lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial."  Tenn. Code Ann. § 40-26-105 (1990); State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1995).  The procedure in *error coram nobis* suits is governed by the rules applicable to civil cases to the extent the civil rules do not conflict with the provisions of Tenn. Code Ann. § 40-26-

31

105. <u>Hart</u>, 911 S.W.2d at 374 (citations omitted). The procedure is almost identical in nature to a motion for a new trial predicated upon newly discovered evidence. <u>Id</u>. (citing <u>Teague</u>, 772 S.W.2d at 920). As a practical matter, the only difference is the time in which the issue must be raised. <u>Id</u>. (footnote omitted).

> The petition for *writ of error coram nobis* must contain:
>
> (a) the grounds and nature of the newly discovered evidence;
>
> (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial;
>
> (c) the appellant "was without fault in failing to present" the newly discovered evidence at the appropriate time; and
>
> (d) the relief sought by the appellant.

<u>Hart</u>, 911 S.W.2d at 374-375 (citing Tenn. R. Crim. P. 47) (internal citations omitted). The petition filed by the appellant in the present case satisfies these requirements.

Additionally, affidavits should be filed in support of the petition or at some point in time prior to the hearing. <u>Id</u>. at 375 (citations omitted). An affidavit, like the testimony of a witness, must be relevant, material and germane to the grounds raised in the petition; and the affiant must have personal knowledge of the statements contained in the affidavit. <u>Hart</u>, 911 S.W.2d at 375 (citations omitted). Affidavits which fail to meet these criteria will not justify the granting of an evidentiary hearing since the information contained in the affidavits, taken as true, would not entitle the petitioner to relief. <u>Id</u>. (citation omitted). However, if the affidavits are sufficient and the petition satisfies the above enumerated criteria, the trial court should not determine the merits of the petition on the strength of the affidavits alone. <u>Id</u>. (citing <u>Hicks v. State</u>, 571 S.W.2d 849, 854 (Tenn. Crim. App.),

32

perm. to appeal denied, (Tenn. 1978)).[10]

In the present case, the affidavits are sufficient and the petition satisfies the enumerated criteria. Thus, the better procedure would have been to grant the appellant an evidentiary hearing on the petition. Nonetheless, we acknowledge that, before the appellant would be entitled to relief, it must be established that the subsequently or newly discovered evidence "may have resulted in a different judgment had it been presented at the trial." Tenn. Code Ann. § 40-26-105. We cannot discern the importance of Kay Mason's testimony in regards to the guilt or innocence of the appellant. See *supra* Section I, Brady Issue. Moreover, Williams' testimony merely corroborates the appellant's recitation of his version of the facts, which was contradicted at trial by witnesses for the State. Evidence which is simply cumulative to other evidence in the record, or serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial will not justify the granting of a petition for the writ when the evidence, if introduced would not have resulted in a different judgment. See Hart, 911 S.W.2d at 375 (internal citations omitted).

The trial court determined that "[the testimony of Kay Mason and John Edward Williams] would not change the outcome of the trial." The decision to grant or deny a petition for the *writ of error coram nobis* on the ground of newly discovered evidence rests within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; Hicks, 911 S.W.2d at 375. Based upon our review of the record and the facts of this case, the appellant's "newly discovered evidence" would not have resulted in a different judgment if the evidence had been admitted in the previous trial. The proof showed that the appellant, who was covered in blood, was seen by

---

[10]In Hicks v. State, 571 S.W.2d at 852, this court, addressing an issue of newly discovered evidence raised in a motion for new trial, said that "[t]o grant relief on affidavits only would deny the opposing party an opportunity to test the accuracy or veracity of the information contained therein by confrontation or by evidence contrary to this assertion." See Hart, 911 S.W.2d at 375, footnote 2.

a police officer as he was leaving the apartment building following the murders. His fingerprints were throughout the apartment. Three cans of Colt 45 malt liquor were found on a small table in the Christopher apartment. There was proof that the appellant purchased this type of beer earlier that day, and the open can of beer had the appellant's fingerprints on it. Moreover, Type O blood, that of the victims, was found on the appellant's bag, shirts, and shoes, even though he had Type A blood.

The appellant's own testimony was damning. Incredibly, he testified at trial that he went into the apartment and found the Christophers. In trying to explain how he had so much blood on him, the appellant testified that it happened when he pulled the knife out of Ms. Christopher's neck. As Ms. Christopher reached for him, she fell and hit the kitchen wall, splattering him with blood. This, of course, was after Ms. Christopher had been stabbed forty-one times. The appellant fled the scene, assaulting a police officer as he ran, and was later found hiding in a friend's attic. The appellant's baseball cap was found intertwined in Lacie's arm, although he did not recall his hat falling off. Moreover, we note that the time frame of the murders virtually precludes any person other than the appellant from committing these crimes. Witnesses at trial testified that, after they heard screaming from the upstairs apartment, they saw no one go up or down the stairs. The resident manager, Wilson, testified that, after the screaming stopped, she heard a person walk into the bathroom and heard water running. She then heard a person walk across the floor, slam the door shut and then run down the steps. The police were on the scene at that point in time with the first officer observing the appellant as he ran down the stairs covered in blood. There is no question as to the confidence in the jury's verdict. Thus, the appellant suffered no prejudice by the trial court's denial of an evidentiary hearing. This issue is without merit.

## V.  Conclusion

After a thorough review of the record and the law applicable to the issues raised herein, we find, regarding the appellant's petition for post-conviction relief, the appellant has failed to prove his allegations by a preponderance of the evidence. Kerley, 820 S.W.2d at 755.  Accordingly, we accredit the findings of the trial court in denying post-conviction relief.  Additionally, regarding the petition for *writ of error coram nobis*, we conclude that although the better procedure would have permitted an evidentiary hearing on the issues, the trial court correctly concluded that the "new evidence" would not have resulted in a different judgment and, thus, the appellant suffered no prejudice by the court's denial of an evidentiary hearing.  The judgment of the trial court is affirmed as to both petitions.

The appellant's sentence of death by electrocution shall be carried out on April 22, 1998, unless otherwise stayed by an appropriate order.

_____
DAVID G. HAYES, JUDGE

CONCUR:

_____
GARY R. WADE, JUDGE

_____
JOE G. RILEY, JUDGE